58 393
58 405
58 393
63 536
58 393
64 133
58 393
73 188
58 393
52 LRA 809

## STATE OF MINNESOTA vs. C. W. RODMAN.

## SAME vs. R. E. COBB.

Submitted on briefs by the state, argued by defendants, May 24, 1894. Affirmed July 25, 1894.

Nos. 8712, 8873.

**Game law construed.**

Laws 1891, ch. 9, § 11, as amended by Laws 1893, ch. 124, § 9, construed as prohibiting the having in possession, more than five days after the commencement of the closed season, certain kinds of game, although lawfully taken or killed during the open season.

**The State under its police power can protect wild game.**

*Held*, that this statute is a proper exercise of the police power of the state to protect and preserve wild game, because reasonably tending to prevent the unlawful killing of such game during the closed season.

**Under the police power the State may regulate the possession of game.**

It is within the police power of the state to enact such laws as will preserve from extermination or undue depletion wild game adapted to consumption as food, or to other useful purpose; and to that end the state may adopt any reasonable regulations, not only as to the time and manner of taking or killing such game, but also imposing such limitations or restrictions upon its use, or the right of property in it, after it is taken or killed, as will tend to prevent such extermination or depletion.

**The subject of Laws 1893, ch. 124, is expressed in its title.**

Held, that the subject of the amendatory act Laws 1893, ch. 124, is sufficiently expressed in its title.

**The punishment not excessive or unusual.**

The provisions of section 11 of the act, as amended, are not obnoxious to that part of the constitution which prohibits the imposition of excessive fines.

C. W. Rodman was indicted January 9, 1894, by the Grand Jury of Ramsey County for the crime of wrongfully, unlawfully, and willfully having in his possession and under his control at No. 18 West Third street in St. Paul, on December 1, 1893, two prairie chickens, two whitebreasted grouse and parts of the flesh of sixteen deer, contrary to Laws 1891, ch. 9, as amended by Laws 1893, ch. 124. When arraigned before the court, defendant demurred to the indictment on the ground that the facts stated therein do not constitute a public offense. The court, John W. Willis, J., overruled the demurrer and on the request of the accused reported the case, so far as was necessary to present the questions of law arising thereon and certified the report to this court, and stayed all further proceedings until the decision of this court thereon should be made (1878 G. S. ch. 117, § 11.) The record contained a copy of the indictment, demurrer and order.

R. E. Cobb was also indicted January 9, 1894, by the same Grand Jury for the crime of wrongfully, unlawfully and wilfully having in his possession and under his control at No. 294 East Sixth street in St. Paul on December 1, 1893, parts of the flesh of fifty eight deer contrary to the same statutes. When arraigned before the same court he also demurred to the indictment on the same ground. The court overruled the demurrer and on his request reported the case and certified the report to this court and stayed proceedings.

*D. D. Williams,* for defendant Rodman.

*Briggs & Countryman,* for defendant Cobb.

It is admitted by the state that the game described in the indictment was lawfully killed and possessed in the open season and kept in possession after the season closed. The state has no absolute property in game or animals *feræ naturæ* within its borders. These animals are fugitive by nature and in a wild state lack the essential elements of property, in this, that they cannot be the subjects of control or possession.

By the civil law animals *feræ naturæ* were held to be the property of nobody, and became the property of him who first possessed them, every man having an equal right of pursuing and taking such animals to his own use. At the time the northern hordes overran the Roman Empire this law was abrogated, it being the desire of the conquerors to preserve the game for themselves, and to keep the rustici, or natives, of the country from the use of arms. To further this purpose game was declared to be the property of the king, and only persons who had a license from him were permitted to kill game. These laws having their origin in slavery were introduced into England at the time of the Norman conquest, and became the common law of England, and the king granted special license to certain persons to kill game. Later the privilege was granted to persons having a certain rank, or an income of more than a certain amount per annum.

As these laws were tyrannical, unjust and unnatural, to support them violations thereof were punished by the most severe penalties, not infrequently by the infliction of the death penalty. These laws are not adapted to the condition of society in this country, although some recent decisions which will be cited by the state have falsely declared the common law of England upon this subject to be the common law of this country. But the American people have adopted the civil or natural law, which holds that animals *feræ naturæ* are *bona vacantia,* incapable of control or possession, and become the property of him who first possesses them. *State* v. *House,* 65 N. C. 315.

The state may, as an act of police jurisdiction, and for the purpose of protecting game animals from destruction, pass reasonable laws for their protection. And these laws are not based upon the

fact that the state has an absolute title and property in game animals, but upon the ground that the public has a right to preserve them from extermination.

Under our statutes there is only one way that a person having game in his possession upon November 25th can escape the severe penalties of this harsh and arbitrary law, and that is by destroying it. He cannot ship it out of the state for that is prohibited by the act, he cannot sell it for the possession of the purchaser would be criminal. The law requires the citizen to do that with his property, which he has lawfully acquired, which the state would not have a right to do with its own property, for the state cannot destroy its property except some public necessity requires it. The act is in violation of the Constitution of this State and of the fourteenth amendment of the Constitution of the United States, which provides that no person shall be deprived of his property without due process of law. *Allen* v. *Young,* 76 Me. 80; *Commonwealth* v. *Wilkinson,* 139 Pa. St. 304; *State* v. *McGuire,* 24 Oregon, 366; *Guyer* v. *The Queen,* 23 Q. B. D. 100; *People* v. *O'Neil,* 71 Mich. 325.

The statute is to be construed as prohibiting only the having possession of game unlawfully caught, taken or killed. *Commonwealth* v. *Hall,* 128 Mass. 410; *State* v. *Beal,* 75 Me. 289; *Bennett* v. *American Exp. Co.,* 83 Me. 236; *Simpson* v. *Unwin,* 3 B. & Ad. 134; *Davis* v. *McNair,* (Ontario) 21 Cent Law. J. 480; *State* v. *Craig,* 80 Me. 85.

Laws 1893, ch. 124, violates the constitutional requirement that no law shall contain more than one subject, which shall be expressed in its title. *People* v. *Hills,* 35 N. Y. 449.

The act, so far as it relates to punishment for having game in possession, is in violation of the Bill of Rights (Const. Minn. Art 1, § 5) declaring that excessive fines shall not be imposed, nor cruel or unusual punishment inflicted.

*H. W. Childs,* Attorney General, and *Pierce Butler,* County Attorney, for the State.

*Wm. Ely Bramhall,* for Game and Fish Commissioners.

The state has the right to provide how, when, where and for what purposes those within its jurisdiction may acquire or use the food

birds, animals and fish *feræ naturæ* found within its limits. *Gentile* v. *State*, 29 Ind. 409; *Magner* v. *People*, 97 Ill. 320; *American Exp. Co.* v. *People*, 133 Ill. 649; *Commonwealth* v. *Gilbert*, 160 Mass. 157.

There are only three utterances of the court which seem opposed to this view, and these when closely examined and analyzed will be found, if not sustaining this doctrine, at least not denying it. These are *State* v. *McGuire*, 24 Oregon 366; *People* v. *O'Neil*, 71 Mich. 325; *James* v. *Wood*, 82 Me. 173.

The complete control which the legislature has over its game and fish is well illustrated by the following decisions: *Chambers* v. *Church*, 14 R. I. 398; *Allen* v. *Wyckoff*, 48 N. J. Law 90; *People* v. *Fishbough*, 58 Hun 404.

It is made unlawful by Section 9 to have venison killed in this state in possession between November 25, and November 1, following, irrespective of the time when killed. The language used being clear, unambiguous and unequivocal, gives no chance for the interpretation that the offense does not extend to that which was lawfully killed. *Phelps* v. *Racey*, 60 N. Y. 10; *Magner* v. *People*, 97 Ill. 331.

In some of the cases the game found in the possession of the accused was killed outside the state and was not within the language forbidding the possession of any animal thus killed, as does our statute. *Whitehead* v. *Smithers*, 2 C. P. D. 553; *People* v. *Racey*, 60 N. Y. 10; *Roth* v. *State*, 7 Ohio C. C. 62; *State* v. *Randolph*, 1 Mo. App. 15; *State* v. *Craig*, 80 Me. 85.

But where the game statutes have been framed like ours as in Kansas, Missouri and New York they have always been held to cover game lawfully killed. *State* v. *Saunders*, 16 Kan. 127; *State* v. *Judy*, 7 Mo. App. 524; *Phelps* v. *Racey*, 60 N. Y. 10.

It is however said to be unreasonable to oblige one to destroy wholesome food instead of allowing it to be retained for use. The argument has some plausibility upon its face, but is without foundation. Experience has taught that some time must be fixed after which it shall be unlawful to have it in possession, and the same arguments which are launched against the five day clause would be equally applicable to any other period that might be fixed therefor.

*Roth* v. *State,* 7 Ohio C. C. 62; *Phelps* v. *Racey,* 60 N. Y. 10; *State* v. *Judy,* 7 Mo. App. 524.

Excessive fines are not imposed, nor cruel nor unusual punishments inflicted by this act. *Mims* v. *State,* 26 Minn. 494; *New York Ass'n* v. *Durham,* 51 N. Y. Super. 306; Cooley Const. Lim. 402, 403.

The subject of the act is expressed in its title. *City of St. Paul* v. *Colter,* 12 Minn. 41; *State ex rel.* v. *Smith,* 35 Minn. 257; *State ex rel.* v. *Bigelow,* 52 Minn. 307.

COLLINS, J. These defendants were separately indicted for having in possession, more than five days after the end of the open season, parts of the flesh and meat of deer, contrary to the provisions of Laws 1891, ch. 9, § 11, as amended by Laws 1893, ch. 124, § 9, which reads thus:

"No person shall catch, take or kill, or have in possession or under control for any purpose whatever, any fawn, at any time, nor elk, moose, caribou, or antelope, before the first day of January, 1898; nor any variety of deer, at any time between the twentieth day of November and the first day of November following, except that when the same have been lawfully caught, taken or killed, they may be had in possession or under control for five days, after the time herein limited, for use in the manner and for the purposes herein allowed. Whoever shall offend against any of the provisions of this section shall be guilty of a misdemeanor, and shall upon conviction thereof be punished by a fine of not less than fifty dollars nor more than one hundred dollars and costs of prosecution, or by imprisonment in the county jail for not less than sixty days nor more than ninety days for each and every such animal so caught, taken, killed or had in possession or under control."

Upon the argument of demurrers to the indictments, it was admitted by the prosecution that the deer referred to had been killed in the open season. The court, having overruled the demurrers, certified to this court the following questions of law as having been raised on the argument, and decided in favor of the state, viz.:

"(1) That Laws 1893, ch. 124, is unconstitutional and void;

(2) That the Legislature had not the power to make it an offense

to have in possession birds, animals, or fish, during the closed season, which had been killed and reduced to possession during the open season;

(3) That, if the Legislature has this power, it has not exercised it, and that this act does not make it an offense to have in possession, during the closed season, birds, animals, or fish which have been killed and reduced to possession during the open season;

(4) That the act is void by reason of the excessive fines imposed by it;

(5) That the indictment does not state a public offense."

1. By the third and fifth propositions the same question is raised, and they go merely to the construction of the act, and for that reason should be first considered.

The contention of defendants is that the act should be construed as prohibiting only the having in possession, during the closed season, game unlawfully caught, taken, or killed.   On this we need but to say that the language of the act is so clear, plain, and unambiguous as to leave no room for any such construction.   It is perfectly obvious that it makes it an offense to have in possession, during the closed season, any game caught or killed in the state, the time when it was caught or killed being immaterial.

2. The first, second, and fourth propositions raise the question of the validity of the act.   The points made against its constitutionality are—First, that the legislature has no power to make it an offense to have in possession, during the closed season, game lawfully killed and reduced to possession during the open season, especially for the reason that it deprives a person of his property without due process of law; Second, that the act violates the constitutional requirement that no law shall contain more than one subject, which shall be expressed in its title; Third, that the act, so far as it relates to punishment for having game in possession, is in violation of the bill of rights (Const. art. 1, § 5), declaring that excessive fines shall not be imposed, etc.   It is claimed that the act in question proceeds upon the plan of first declaring all wild game and fish within the state to be its absolute property, and then, upon that basis, providing how, and under what limitations, persons may acquire a qualified right of property in them from the state.

Counsel for defendants contend strenuously that the state has no

proprietory right in animals *feræ naturæ*, and can acquire none by mere legislation; that such animals are *bona vacantia*, in which a right of property can be acquired only by reducing them to possession. If it was the intention of the Legislature to declare all wild game the property of the state, in a proprietory sense, that feature of the law might be subject to counsel's criticism; but that question is not material here, for it is not necessary to resort to any such doctrine as the source of the power of the state to adopt police regulations for the preservation of wild game within its borders. We take it to be the correct doctrine in this country that the ownership of wild animals, so far as they are capable of ownership, is in the state, not as proprietor, but in its sovereign capacity, as the representative, and for the benefit, of all its people in common. The preservation of such animals as are adapted to consumption as food, or to any other useful purpose, is a matter of public interest; and it is within the police power of the state, as the representative of the people in their united sovereignty, to enact such laws as will best preserve such game, and secure its beneficial use in the future to the citizens, and to that end it may adopt any reasonable regulations, not only as to time and manner in which such game may be taken and killed, but also imposing limitations upon the right of property in such game after it has been reduced to possession.

Such limitations deprive no person of his property, because he who takes or kills game had no previous right of property in it, and, when he acquires such right by reducing it to possession, he does so subject to such conditions and limitations as the Legislature has seen fit to impose. It is upon this principle that laws have been sustained which restricted the use of such game to the people of the state in which it was caught or killed, and prohibited its being shipped out of such state as an article of commerce; the reason being that to permit game to become an article of commerce, even during the open season, would stimulate the killing to an extent leading to its total extermination. In short, the object to be attained is the preservation from extinction or undue depletion of game; and the Legislature may pass any reasonable laws to effect that end, even to the extent of restricting the use of, or right of property in, the game after it is taken or killed. All so-called game laws proceed upon that principle, and their constitutionality has rarely, if ever, been successfully as-

sailed. *Organ* v. *State*, 56 Ark. 267, (19 S. W. 840;) *State* v. *Geer*, 61 Conn. 144, (22 Atl. 1012;) *Magner* v. *People*, 97 Ill. 320; *American Exp. Co.* v. *People*, 133 Ill. 649, (24 N. E. 758;) *Gentile* v. *State*, 29 Ind. 415; *Phelps* v. *Racey*, 60 N. Y. 10.

No court would be justified in declaring unreasonable the provision limiting the time to five days after the commencement of the closed season, during which a person may lawfully retain possession of game taken or killed during the open season. What this provision aims at is not the mere fact of possession of game lawfully obtained, but to prevent its being unlawfully taken or killed. If it were permitted to have possession during the closed season, without limitation, of game taken or killed during the open season, it would inevitably result in frequent violations of the law, without the least probability of a discovery. Game is usually found in secluded places, away from habitations of men, with no one to witness the killing but the hunter himself. The game would have no earmarks to show whether it was taken or killed in the open or the closed season, and hence conviction under this statute would ordinarily be impossible, and the law would become practically a dead letter. In these days of cold-storage warehouses, the mere lapse of time after the expiration of the open season would furnish little aid in an effort to prove that the game had been taken or killed out of season. The regulation is one which reasonably tends to prevent the taking or killing of game in the closed or forbidden season, and is therefore a legitimate exercise of the police power. *Roth* v. *State*, 7 Ohio Cir. Ct. R. 62; *Phelps* v. *Racey*, *supra*.

There is nothing in the point made by counsel for defendants as to the construction of this "five-days" limitation. The evident intent of the legislature was to extend the open season for possession five days beyond the end of the open season for killing.

We fail to discover any merit in the point that the subject of the amendatory act of 1893 is not expressed in its title. The title of the original act, approved April 20, 1891, is "An act for the preservation, propagation and protection of the game and fish of the state." The title of the amendatory act is, "An act to amend an act for the preservation, propagation and protection of game and fish of the state of Minnesota, approved April 20, 1891." It would be difficult to con-

ceive of a title that would more clearly express the subject of an act pertaining to this matter, and every provision in both the original and amendatory acts is entirely germane to the subject legislated upon.

The only remaining question is whether the act is obnoxious to the constitutional provision against the imposition of excessive fines, or the infliction of cruel or unusual punishments. The latter clause of the provision is directed, not so much against the amount or duration of the punishment, as against the character of it,—what was in mind being those punishments which were cruel and degrading in their nature, and which had been condemned by public opinion years before the adoption of our constitution.

The punishment for offenses against game laws are usually graduated in one of two ways,—either by making the unlawful killing or possession of each animal a separate and distinct offense, or (which works out the same result) by graduating the penalty according to the number of animals killed or possessed, so that the greater the offense the greater the punishment. This method of graduating punishment is distinctly recognized in many of our criminal statutes. Our game law is not more severe in its penalties than the game laws of other states, the validity of which, in this respect, has rarely been questioned, so far as we have discovered. *Blydenburgh* v. *Miles*, 39 Conn. 484; *State* v. *Craig*, 80 Me. 85, (13 Atl. 129;) *New York Ass'n* v. *Durham*, 51 N. Y. Super. Ct. 306. See, also, *Mims* v. *State*, 26 Minn. 494, (5 N. W. 369;) Cooley, Const. Lim. 401. While the fines imposed are certainly large, yet we cannot say that they are excessive, in a constitutional sense. A large discretion is necessarily vested in the legislature to impose penalties sufficient to prevent the commission of an offense, and it would have to be an extreme case to warrant the courts in holding that the constitutional limit had been transcended.

Orders affirmed.

BUCK, J., did not sit.

(Opinion published 59 N. W. 1098.)