(63 South. 509.)

No. 9,950.

STATE v. MORGAN.

In re MORGAN.

(May 26, 1913. On Rehearing Dec. 1, 1913.)

*(Syllabus by the Court.)*

1. GAME (§ 4*)—STATUTES—CONSTRUCTION.

Acts Nos. 127 and 204 of 1912, pp. 151, 401, are companion acts, with reference to the conservation of the natural resources of the state, and are not contradictory of one another.
[Ed. Note.—For other cases, see Game, Cent. Dig. § 3; Dec. Dig. § 4.*]

2. GAME (§ 5*) — LICENSES — APPLICATION OF STATUTE—MARKET HUNTERS.

The provisions of section 14 of Act No. 127 of 1912 "that no person shall at any time, hunt, pursue, or kill with a gun any of the wild quadrupeds or birds that are protected during any part of the year, or take with traps or other devises without first having procured a license to do so, and then only during the respective periods of the year when it shall be lawful," has application to "market hunters," although such "market hunters" may have hunted within the wards of their respective domiciles; and they are liable to prosecution for hunting without licenses.
[Ed. Note.—For other cases, see Game, Cent. Dig. § 4; Dec. Dig. § 5.*]

On Rehearing.

3. GAME (§ 5*)—LICENSES—TRAPPERS—CRIMINAL PROSECUTIONS.

Trappers are no more included among those to whom licenses may be issued, under section 13 of Act 127 of 1912, than they are included among residents, hunting on their own lands, etc., who are exempted from the payment of licenses, under section 9 of that act; and, as section 14 prohibits trapping, without a license, and no license is authorized, it follows that one who traps is liable to the penalties imposed by the act.
[Ed. Note.—For other cases, see Game, Cent. Dig. § 4; Dec. Dig. § 5.*]

4. GAME (§ 9*)—WORDS AND PHRASES—"PARENTHESIS"—CRIMINAL PROSECUTIONS—INFORMATION—CONSTRUCTION.

A "parenthesis" being "a word, phrase, or sentence, by way of comment or explanation, inserted in, or attached to, a sentence which would be grammatically complete without it," the parenthesis, in a bill of information charging that the party named "did take with traps, for profit (market hunting), during the open season, 10 minks," etc., "is held to interpret and explain the charge, as otherwise expressed, to mean a charge of "market hunting," rather than of trapping, and, as such, not to be supported by proof of trapping, since the act plainly distinguishes between hunting and trapping.
[Ed. Note.—For other cases, see Game, Cent. Dig. § 9; Dec. Dig. § 9.*
For other definitions, see Words and Phrases, vol. 6, p. 5174.]

Mortimer Morgan was convicted of violating the game law, and applies for writs of certiorari and prohibition. Affirmed.

Minos T. Gordy, Jr., and Kitchell & Bailey, all of Abbeville, for relator. R. G. Pleasant, Atty. Gen., and Harry P. Gamble, Asst. Atty. Gen., for the State.

SOMMERVILLE, J. Defendant is charged as follows:

"That he unlawfully did take with traps for profit (market hunting) during the open season,

ten minks, six otters, and three raccoons, without then and there first procuring a license from the sheriff and ex officio tax collector of Vermilion parish, La., so to do"

—in violation of section 14, Act No. 127, 1912, p. 151; the penalty being a fine of not less than $25 nor more than $100, or imprisonment for not less than 30 days, or both, in the discretion of the court. Section 28.

Defendant moved to quash the information on the ground that the Legislature had made no provision for the payment of a trapper's license, and that he has not been guilty of the violation of any law which forbids the trapping of animals without the payment of a license, and specially within the ward in which he is domiciled.

The motion was overruled, and defendant invokes the supervisory jurisdiction of this court, and the reversal of the judgment of the district court.

[1] The Legislature, by Act No. 204, 1912, p. 401, provides for the conservation of the natural resources of the state of Louisiana, "including the natural wild life on land and in the waters of the state, and also, the soil, mineral and forestry resources of the state," etc.; and by Act No. 127, 1912, p. 151, there was created a "Conservation Commission of Louisiana, defining its duties and powers and constituting it a department of the government," etc. Among the powers granted in this last act is the right "to issue licenses and levy and collect the charges thereon, and to provide for the revenues to maintain and support the same," etc.

These two acts are companion statutes, introduced by the same member of the Legislature, at one session, and adopted within a few days of one another. They will be construed together.

In section 2 of Act No. 204 it is provided:

"That no person at any time of the year shall pursue, take, wound, or kill in any manner, number or quantity any fish, birds, or wild quadrupeds protected by law, or buy, sell, offer or expose the same or any part thereof for sale, transport or have the same in possession, except as permitted by law," etc.

And, in section 6 of the same act it is provided:

"That mink, otters, muskrats and raccoons may be taken in any manner bought and sold and possessed from November first to February first both inclusive; except that muskrats may be killed at any time when found within two miles of any levee; and provide further that the owner of any place on which any of said animals are depredating may kill them at any time."

And section 14 of Act No. 127, page 158, provides:

"That no person shall at any time hunt, pursue, or kill with a gun any of the wild quadrupeds or birds that are protected during any part of the year, or take with traps or other devices without first having procured a license to do so, and then only during the respective periods of the year when it shall be lawful."

It is this last provision of law which defendant stands charged with having violated.

Our law has always recognized the division of things into classes, recognizing public things as those—

"the property of which is vested in a whole nation, and the use of which is allowed to all the members of the nation; of this kind are navigable rivers, seaports, roadsteads and harbors, highways and beds of rivers, as long as the same are covered with water. Hence it follows that every man has the right freely to fish in the rivers, ports, roadsteads, and harbors." C. C. 453.

The law is taken from the Napoleon Code, articles 714 and 715:

"There are things which belong to no one, and the use of which is common to all. Police regulations direct the manner in which they may be enjoyed; the faculty of hunting and fishing is also regulated by special laws."

These principles are recognized by the common law of Germany, the law of Austria, Italy, and in all the countries of Europe. The common law of England also based property in game upon the principle of common ownership, and therefore treated it as subject to governmental authority. Mr. Blackstone says, in connection therewith:

"It follows from the very end and constitution of society that this natural right, as well as many others belonging to a man as an individual, may be restrained by positive laws enacted for reasons of state or for the supposed benefit of the community." 2 Blackstone, Com. 410.

And in most of the states of the Union laws have been passed for the protection and preservation of game. This common ownership, and its resulting responsibility in the state, is thus stated in a well-considered opinion of the Supreme Court of California:

"The wild game within a state belongs to the people in their collective and sovereign capacity. It is not the subject of private ownership, except in so far as the people may elect to make it so; and they may, if they see fit, absolutely prohibit the taking of it, or any traffic and commerce in it, if it is deemed necessary for its protection or preservation, or the public good." Ex parte Maier, 103 Cal. 476, 37 Pac. 402, 42 Am. St. Rep. 129.

The same view has been expressed by the Supreme Court of Minnesota as follows:

"We take it to be the correct doctrine in this country that the ownership of wild animals, so far as they are capable of ownership, is in the state, not as a proprietor, but in its sovereign capacity as the representative, and for the benefit of all its people in common." State v. Rodman, 58 Minn. 393, 59 N. W. 1098.

This principle was recognized by us in the case of Herbert Rives et al. v. Gulf Refining Company of Louisiana, 62 South. 623, ante, p. 178; Ohio Co. v. Indiana, 177 U. S. 190, 20 Sup. Ct. 576, 44 L. Ed. 729; Geer v. Connecticut, 161 U. S. 519, 16 Sup. Ct. 600, 40 L. Ed. 793.

So that the Legislature of Louisiana has the undoubted right to prohibit and to regulate the killing of game in the state during certain seasons; and provide, further, that no one shall hunt, pursue, kill or take wild animals in the open season "without first having procured a license to do so."

[2] If the Legislature has failed to provide for the payment of license taxes for the taking of certain game by traps during the open season, then it follows, by necessary inference, that this method of hunting or trapping cannot be indulged in at any time; and, if defendant has trapped the animals named in the bill of indictment against him, he has violated the law.

Defendant argues that the evidence shows that he trapped the animals mentioned on land on the inside of the ward in which his domicile is located, and that he is exempted from the payment of a license therefor by the terms of the statute. He refers to section 9 of the act, which defines the duties of the conservation agents, as follows:

"That it shall be the duty of said conservation agents to see that every person hunting, trapping, seining, shipping or dealing in any way in any of the natural resources of this state in the territory assigned to each agent for which a license must be obtained as hereinafter provided has in his possession, or is the owner of any official license as provided by law, except in case of a resident hunting on his own lands or on lands for agricultural purposes or on lands inside the ward in which his domicile is located."

Said section does not attempt to impose licenses upon any one; the imposition of the payment of license fees is found in section 13 of the act, nor does it attempt to provide for the collection of licenses; that is also provided for in section 13. The former section simply defines the duties of the conservation agents, and nothing more.

Section 13, just referred to, is as follows:

"That the Conservation Commission of the state of Louisiana, during the month of June of each year, shall send to the tax collector in each parish of the state, a book or books containing a regularly numbered series of official hunting and trapping licenses bearing a fac simile signature of the president of the commission, which license shall be issued by the said tax collectors to all persons applying for same at the rate of fifty cents for all residents hunting in their own parish outside the limits of the wards in which their domicile is located, and three dollars for a state-wide license. Fifteen dollars for all nonresidents and unnaturalized foreign-born residents, except those unnaturalized foreign-born residents hunting on their own land, and ten dollars for persons who hunt for profit and are commonly known as 'market hunters,' except that nonresidents or unnatural-

ized foreign-born residents shall not be permitted to hunt or trap for profit," etc.

It may be that the Legislature considered trapping as a form of hunting, for the words are used indiscriminately in the act; and, when it imposed, in section 13, a license of "ten dollars for persons who hunt for profit and are commonly known as 'market hunters,'" it provided for the issuance of a license of $10 to all persons who trap or "hunt for profit and are commonly known as 'market hunters,'" and it is this offense with which defendant stands charged. The information reads:

"He unlawfully and willfully did take with traps, for profit (market hunting) during the open season ten mink, six otters, and three raccoons, without then and there first procuring a license from the sheriff and ex officio tax collector of Vermilion parish, La., so to do."

It is therefore merely one of the questions of fact involved in the case, over which this court has no control, as to whether defendant is a "market hunter" who hunts for profit, or if he is one who is "commonly known as a 'market hunter,'" who hunts for profit.

It is therefore ordered, adjudged, and decreed that the preliminary writ of prohibition herein issued is withdrawn and set aside, and that the judgment appealed from is affirmed, at the cost of relator.

### On Rehearing.

MONROE, J. The information upon which relator was convicted reads (in part):

"That one Mortimer Morgan, * * * on or about the 15th day of December, 1912, at and in the parish, district, and state aforesaid, unlawfully and willfully did take, with traps, for profit (market hunting), during the open season, ten minks, six otters, and three raccoons, without then and there first procuring a license from an ex officio tax collector of Vermilion parish, La., so to do," etc.

It is admitted that defendant is domiciled in the seventh ward of the parish of Vermilion, and that the taking of animals, with traps "(market hunting)" was charged against him, wholly done upon lands in that ward. It is further admitted that the only form of license issued by the Conservation Commission to the hunters and trappers in that parish reads as follows:

"Conservation Commission of Louisiana.

"——————————

"——————————

Resident Market Hunter's License

having paid ten dollars ($10.00) is hereby licensed to hunt under the provisions of the state laws in the state of Louisiana for the season ending June 1, 1913. "I am —— years of age. Date issued ——.

"No. 3115.    Tax Collector of the Parish "M. L. Alexandre,    of Vermilion. "President of Conservation "Commission of Louisiana."

The provisions of law which bear more particularly upon the question presented for consideration are found in Act 127 of 1912, and read as follows:

"Section 9. That it shall be the duty of said conservation agent to see that every person, hunting, trapping, seining, shipping, or dealing in any way in any of the natural resources of this state in the territory assigned to each agent for which a license must be obtained as hereinafter provided has in his possession, or is the owner of any" (an) "official license as provided by law, except in the case of a resident hunting on his own lands or on lands leased for agricultural purposes or on lands inside the ward in which his domicile is located.

"*     *     *     *     *     *

"Section 13. That the Conservation Commission * * * during the month of June of each year, shall send to the tax collector of each parish of the state, a book or books containing a regularly numbered series of official hunting and trapping licenses bearing the fac simile signature of the president of the commission, which licenses shall be issued by the said tax collectors to all persons applying for same at the rate of fifty cents for all persons hunting in their own parish outside the limits of the wards in which their domicile is located and three dollars for a state wide license. Fifteen dollars for all nonresidents and unnaturalized foreign-born residents, except those unnaturalized foreign-born residents hunting on their own land, and ten dollars for persons who hunt for profit and are commonly known as 'market hunters,' except that nonresidents of" (or) "unnaturalized foreign-born residents shall not be permitted to hunt or trap for profit. On the first of each month, the tax collector shall make return to the treasurer of the state of Louisiana in cash accompanied by a proper report of

all licenses that have been issued, less five per cent. of the sum collected, which amount is to be deducted in full payment of their services in issuing said licenses; and, at the same time, said tax collectors must forward to the Conservation Commission duplicates of such reports. The Conservation Commission shall deposit with the State Treasurer all funds and moneys as received from the tax collector and proper records of said deposits shall be entered on their books covered by receipts or vouchers of the State Treasurer.

"Section 14. * * * That no persons shall at any time hunt, pursue, or kill with a gun any of the wild quadrupeds or birds that are protected during any part of the year, or take with traps or other devices without first having procured a license to do so, and then only during the respective periods of the year when it shall be lawful."

Section 28 imposes a penalty of fine or imprisonment, or both, for violation of any of the provisions of the act.

It will be noted that section 9 provides, in effect, that each conservation agent, acting within the territory to which he is assigned, is required "to see that every person, hunting, trapping, seining, shipping," or engaged in any other dealings with the natural resources of the state "for which a license must be obtained as hereinafter provided has * * * an official license, as provided by the law," and that there is excepted from the license requirement the "resident, hunting on his own lands, or on lands leased for agricultural purposes, or on lands inside the ward in which his domicile is located."

The section, therefore, distinguishes between the resident hunting on his own lands, on lands leased for agricultural purposes, and on lands in the ward in which he has his domicile, on the one hand, and the trapper, seiner, and dealer, on the other hand; and, whilst relieving the resident hunter, so engaged, from the obligation to account to the agent for a license, requires the agent to see that all the others mentioned, who may be engaged in any dealing in natural resources *"for which a license must be obtained, as hereinafter provided"* (meaning, as thereafter provided in the statute), are provided with licenses.

[3, 4] In other words, the meaning of section 9 is that the resident, hunting on his own lands, or on lands leased for agricultural purposes, or on lands inside the ward of his domicile, is to have no demand made upon him for a license, but that such demand is to be made upon all others dealing, in any way, in natural resources of whom the statute may thereafter require a license. The question, then, is, Does the statute, thereafter require a license from the trapper? And the answer is that it does not; for there are no other provisions in the act upon the subject than those contained in the sections quoted, and they neither require such a license, nor establish any basis, as to the amount to be paid by trappers, upon which a license can be required. Section 13 requires the commission to send out hunting and trapping licenses; to be issued to all persons applying for them, at the rates of 50 cents for all residents hunting in their own parishes, outside of the wards in which they live, and $3 for such residents hunting throughout the state, $15 for nonresidents and unnaturalized foreign-born residents, "hunting on their own lands," and $10 for persons who hunt for profit and are commonly known as *"market hunters,"* except that "nonresidents of" (or) "unnaturalized foreign-born residents shall not be permitted to *hunt, or trap,* for profit." It will be observed that the distinction which is to be found in section 9, between trapping and hunting is preserved in section 13; for whereas section 13 provides for the issuance of licenses for residents hunting in their own parishes, but outside of their wards, or throughout the state, for nonresidents and unnaturalized foreign-born residents, hunting on their own lands, and for persons who hunt for profit, and are called "market hunters" neither the mentioned until the last clause in the sentence is reached, when it is there declared that "nonresidents of [or] unnaturalized for-

eign-born residents shall not be permitted to hunt, or trap, for profit." It is quite clear, therefore, that trappers are no more included among those to whom licenses are to be issued under section 13 than they are included among the residents, hunting on their own lands, etc., who are exempted from the payment of licenses under section 9, and no one can say what amount they would have been required to pay, whether trapping on their own lands (unless the animals were depredating), in their own wards, or elsewhere; and, if the defendant was found trapping, it would seem to have been the competent and proper thing to have charged him with trapping without a license, since section 14 of the act absolutely prohibits the pursuit, or the taking, without a license, of any wild quadrupeds, with traps, and, as we have seen, there is no other provision in the law under which a trapper's license could be issued or the amount determined. The state has not, however, prosecuted defendant for trapping without a license, but charges that he "did take with traps, for profit (market hunting), during the open season, ten minks," etc.; and we are obliged to give its proper significance to the parenthesis; for, says the lexicographer:

"Parenthesis [is] 1. A word, or phrase, or sentence, by way of comment or explanation, inserted in or attached to, a sentence which would be grammatically complete without it."

The parenthesis "(market hunting)" was therefore inserted in the bill of information in order to explain that the charge, as otherwise expressed in the bill, was intended to carry a meaning different from that which, without the parenthesis, the words used would import; just as the word "or," which we have taken the liberty of inserting, parenthetically, in the clause, "except that nonresidents of" (or) "unnaturalized foreign-born residents shall not be permitted to hunt or trap," was so inserted to explain that the word "of," preceding the parenthesis, should be taken to mean "or." If then, we give the proper meaning and effect to the parenthesis in the bill of information now before us, we are driven to the conclusion that the intention of the bill is to charge defendant, not with trapping, but with "market hunting." And this conclusion is strengthened by the fact that the state does not deny the correctness of the following explanation which relator's counsel offer, in their brief, of the parenthesis in question, to wit: They say, in substance, that the Conservation Commission, realizing that the statute contains no provision for the licensing of trappers, and prohibits trapping without a license, and, being guided, probably, by the provision of section 13 of the statute, which imposes a license of "ten dollars for persons who hunt for profit" and are commonly known as "market hunters," assumed that it would be possible for it to deal with persons who trap for profit as the law authorizes it to deal with those who hunt for profit, and hence that it has issued to such persons "resident market hunters" licenses, being the only kind in its possession, and has demanded that relator accept one of them, pay the price, and go on his way, and that this prosecution has resulted from the unwillingness of relator to comply with the second part of the demand so made. The Conservation Commission can, however, no more violate a plain prohibition of the law than can the relator; and, if it should issue to him the license to hunt, for profit, which it is authorized to issue, and he should use it as his authority for trapping for profit, he would still be liable to the penalty, if prosecuted for trapping without a license. As the matter stands, though he admits the trapping, he is prosecuted according to our interpretation of the charge, for "market hunting," and cannot properly be convicted upon proof of trapping. That does not, however, affect the sufficiency of the charge and affords no grounds for quashing it. Counsel

for relator argue that, even if it were shown that relator had been guilty of "market hunting" without a license, he could be convicted of no offense, in view of the admission that the acts charged were committed wholly upon land within the ward of his domicile, since, under section 9 of the act, the agent of the commission is to require no license from the resident, hunting on such lands. The language of section 9 is general in its reference to hunting, however, and section 13, in providing for licenses of "ten dollars for persons" (excluding none) "who hunt for profit," and are commonly called "market hunters," appears to have established an exception which is to be read into, and construed with section 9; and, so reading and construing, we are not prepared to say, though we do not now so decide, that, taking the different provisions together, all persons engaged in what is commonly known as "market hunting" are not required to obtain licenses, no matter upon what lands they operate. The question of the constitutionality of Act 127 of 1912, in so far as it *prohibits* trapping, is suggested in the brief of relator's counsel, but will not be considered here, since we hold that relator is not charged with trapping, and because it was not raised in the lower court.

For the reasons thus assigned, the decree heretofore entered in this case is now reinstated and made final.