Argued April 5, affirmed June 17, 1924.

EIVIND ALSOS v. F. P. KENDALL ET AL.

(227 Pac. 286.)

**Fish—Fishermen must be Licensed and Citizens.**

1. Laws of 1921, page 156, as amended by Laws of 1923, page 478, when construed as a whole, manifests a legislative intent that all persons, whether employer or employee, actually engaged in catching salmon fish, must be licensed, and citizens of United States.

**Fish—"Boat Puller" must be Licensed.**

2. Plaintiff was within operation of Laws of 1921, page 156, as amended by Laws of 1923, page 478, making it unlawful for any person to engage in salmon fishing unless a citizen, where he was to assist in operation of a boat and gill-net in catching salmon

fish, and one so employed was generally known as a "boat-puller," for whom the statute specifically requires a license.

**Constitutional Law—Provision Held Applicable Only to Citizens of State and not to Resident Aliens.**

3. Constitution, Article I, Section 20, providing that no law shall be passed granting to "any citizen or class of citizens privileges or immunities which shall not equally belong to all citizens," is applicable only to citizens of the state and not to resident aliens.

**Constitutional Law—Resident Alien Entitled to Due Process and Equal Protection.**

4. A resident alien is entitled to the benefit of Constitution of the United States, Amendment 14, providing that no state shall deprive any person of life, liberty or property without due process of law, or deny him equal protection of laws, as well as the protection provided by state Constitution, Article I, Section 31, giving resident foreigners the same property rights as citizens.

**States—Territory of Sovereign State Includes Lakes, Seas and Rivers.**

5. The territory of a sovereign state includes the lakes, seas and rivers entirely inclosed within its limits.

**States—Waters of Columbia River for Purpose of Regulating Fishing are, by Virtue of Compact Between Washington and Oregon, Within Jurisdiction of Either State.**

6. While the waters of Columbia River are open for navigation, for the purpose of concurrently regulating fishing therein by Washington and Oregon, ownership of the soil and jurisdiction in the bed of the river under its tide waters are, by virtue of compact between them, sanctioned by Congress, as much vested in either state as if river flowed wholly within that state.

**Fish—Statute Prohibiting Licensing of Aliens to Engage in Fishing Held not Unconstitutional.**

7. Laws of 1921, page 156, as amended by Laws of 1923, page 478, prohibiting the licensing of an alien to engage in salmon fishing, is not violative of any provision of the federal Constitution, since state in its sovereign capacity holds in trust for its own citizens title to and ownership of fish within the tidal waters of the state, and may lawfully restrict the right to fish to its own citizens.

**Fish—Statute not Unconstitutional Because Prohibiting Aliens from Accepting Employment from One Lawfully Engaged in Fishing.**

8. That Laws of 1921, page 156, as amended by Laws of 1923, page 478, prohibits aliens from accepting employment from one lawfully engaged in fishing, and thereby prevents them from earning a livelihood in that particular occupation, does not render statute unconstitutional, since state's right in the fish are superior to aliens' rights to choose fishing for an occupation.

From Marion: GEORGE G. BINGHAM, Judge.

In Banc.

For appellant there was a brief over the names of *Messrs. McCamant & Thompson* and *Messrs. G. C. & A. C. Fulton,* with an oral argument by *Mr. W. Lair Thompson.*

For respondent there was a brief over the name of *Mr. I. H. Van Winkle,* Attorney General, with an oral argument by *Mr. Willis S. Moore,* Assistant Attorney General.

RAND, J.—Plaintiff, a resident alien skilled in salmon fishing in the Columbia River, applied to the master fish-warden for a boat-puller's license, pursuant to Section 135 of Chapter 105, Laws of 1921, as amended by Section 5 of Chapter 295, Laws of 1923, which provides for a license fee of one dollar for each boat-puller engaged in the taking of salmon. His application was denied upon the sole ground that he was not a citizen of the United States.

1. The Attorney General, appearing on behalf of the defendant fish commissioners and master fish-warden of the state, contends that under Chapter 105, Laws of 1921, as amended by Chapter 295, Laws of 1923, no person, unless he is a citizen of the United States, whether engaged in taking fish for himself or as an employee of another, can be licensed to engage in commercial salmon fishing in the public waters of the state. Plaintiff denies this and insists that under a fair construction of the statute, the statute requires only those persons who are actually engaged in commercial salmon fishing for themselves to be licensed and has no application to persons not fishing for themselves but fishing as employees only of licensed salmon fishermen.

Section 131 of Chapter 105, Laws of 1921, declares
that "it shall be unlawful for any person to fish or
take for sale or profit any salmon * * unless such
person be a citizen of the United States." This lan-
guage, plaintiff contends, evinces the legislative in-
tent to require only those persons engaged in taking
for their own use salmon fish from the public waters
of the state either to be citizens of the United States
or to be licensed, and to exclude from the operation
of the act mere employees of licensed salmon fisher-
men who work for wages and have no interest in the
catch. There might be some basis for this conten-
tion if it were not for other provisions of the statute
which, we think, clearly show a contrary intent. Sec-
tion 132 of Chapter 105 provides: "No license for
taking or catching salmon * * shall be issued to any
person who is not a citizen of the United States."
Section 133 of the same chapter provides the man-
ner in which the citizenship of an applicant for a
license to fish for salmon may be established, while
Section 121 of that chapter makes it unlawful for
any person "to take, catch or fish for, buy, sell, can,
pack or otherwise deal in or handle any salmon fish
* * without first obtaining a license therefor." Sec-
tion 123 of Chapter 105, Laws of 1921, provides: "It
shall be unlawful for any person or persons to oper-
ate or maintain or leave in a condition to take sal-
mon * * in any of the waters of this state at any
time hereafter any * * gill-net * * or any device
* * used in catching salmon * * without first having
obtained from the master fish-warden a license there-
for." Section 135 of Chapter 105, as amended by
Section 5 of Chapter 295, Laws of 1923, provides that
"licenses * * shall be issued to any qualified person
or corporation by the master fish-warden upon ap-

plication therefor and the payment of license fees herein required * * for each person other than employees engaged in the canning, packing or curing of food or shell fish and for each person other than employees purchasing or selling salmon." This section specifically exempts employees engaged in buying, selling, packing or otherwise dealing in salmon fish from the necessity of being citizens of the United States or of having obtained a license before accepting employment in those occupations, but neither it nor any other section of the statute contains any exemption as to employees engaged in taking, catching or fishing for salmon. As the statute specifically enumerates the classes of employees who may engage in particular lines of labor connected with the regulated industry without being citizens of the United States and without having obtained licenses therefor, and has made no such provision for employees engaged in taking, catching and fishing for salmon, it clearly indicates a legislative intent that employees of the class not so enumerated were not to be exempted from the requirement of citizenship and of being licensed before engaging in the occupations not exempted from the operation of the act. Said Section 135, as so amended, also provides that "a separate license shall be required for each * * gill-net" and also provides that "the license fee for each gill-net used in the taking of salmon shall be $7.50 and for each boat-puller license for the taking of salmon * * one dollar ($1); provided, however, that no gill-net license or boat-puller license shall be issued in the name of or to any applicant unless the said applicant is to be engaged personally in the operation of said gill-net or boat used in the operation thereof."

Construing the statute as a whole and giving effect to all of its provisions, it clearly appears that the legislature intended that all persons, whether employer or employee, actually engaged in catching salmon fish, must be licensed and that no person could be licensed who was not a citizen of the United States. That the work in which plaintiff intended to engage and for which he applied for a license brought him within the operation of the act and required him to be licensed before engaging in such work clearly appears from the following facts.

2. This cause was tried in the Circuit Court for Marion County upon an agreed statement of facts filed pursuant to Chapter 13, Title II, Or. L. In effect that chapter provides that parties to a question in controversy, which may become the subject of an action at law between them in a court of record, may submit such question for the determination of such court without action by stating in writing a case containing the facts upon which the controversy depends, subscribing the same in person or by their attorneys and verifying the same by the oaths of the parties to the effect that the controversy is real and the proceeding is taken in good faith to determine the rights of the parties. It provides that "the statement shall be filed with the clerk and from the date of such filing the court shall have jurisdiction of the controversy as if the same were an action pending after a special verdict found and shall proceed to hear and determine the same accordingly." Another statute (Section 152) provides: "A special verdict is that by which the jury find the facts only, leaving the judgment to the court." This statement of facts, which, by statute, is given the effect of a special verdict, was subscribed by plaintiff's attor-

neys and verified by the oath of plaintiff. It recites that the proposed employment for which the plaintiff applied for a license was "to assist the sole owner and licensee, as an employee only, in the navigation of his gill-net fish boat and in the operation of his gill-net in the waters of the Columbia River in the taking and catching of salmon fish during the salmon fishing season for the year 1924." It also recites in substance that some fifteen years ago gill-net fishing boats were operated solely by sails and oars and that to operate the same it was at all times necessary that two men should be engaged in the operation of the boat and gill-net; that during the time boats were so operated by sails and oars, the sole owner was generally known and designated as "captain," while the assistant was generally known and designated as "boat-puller"; that boats are now operated by gasoline engines and propellers, but the sole owner of the vessel still requires at least one person employed thereon to assist him in operating the boat and gill-net, and that this employee so assisting him in the operation of the boat and gill-net is "still generally known as the boat-puller."

The statute itself contains no definition of "a boat-puller" but the statute is sufficiently comprehensive to make it unlawful for any person to engage in fishing for salmon for commercial purposes in any of the public waters of the state unless licensed by the master fish-warden. The agreed statement of facts not only recites that the work in which plaintiff proposed to engage and for which he applied for a license was to assist in the operation of a boat and gill-net in catching salmon fish but also that an employee of a licensed gill-net fisherman engaged in assisting the owner in the operation of his boat and

gill-net in catching salmon fish is still generally known as a boat-puller. Obviously the legislature used the term "boat-puller" in the sense that that term is generally understood by persons engaged in the salmon fishing industry. As so used and as so understood, a boat-puller, under the statute, cannot be licensed unless he is a citizen of the United States.

3. Plaintiff's next contention is that if the act is broad enough to include plaintiff and to require him to be licensed, the requirement of the statute forbidding the licensing of a person because of his alienage, is void and of no effect because in contravention of Sections 20 and 31 of Article I of the Constitution of Oregon and of the Fourteenth Amendment to the federal Constitution in that it deprives the plaintiff of an opportunity of earning his own livelihood. Section 20 of Article I provides that no law shall be passed granting to "any citizen or class of citizens privileges or immunities which, upon the same terms, shall not equally belong to all citizens." Since by the agreed statement of facts it is admitted that plaintiff is an unnaturalized foreign-born resident of the state and not a citizen of the United States or of this state, the provisions of Section 20 of Article I can have no application to him as that applies only to citizens of the state and not to resident aliens: *State* v. *Catholic*, 75 Or. 367 (147 Pac. 372, Ann. Cas. 1917B, 913).

Section 31 of Article I provides: "White foreigners who are or may hereafter become residents of this state shall enjoy the same rights in respect to the possession, enjoyment, and descent of property as native-born citizens," while the Fourteenth Amendment to the federal Constitution provides: "Nor shall any state deprive any person of life, liberty or prop-

erty without due process of law or deny to any person within its jurisdiction the equal protection of the laws."

The Attorney General contends that the enactment of the statute in question (it being designed to regulate fishing in the public waters of the state), was a valid exercise of the police power of the state, even though it resulted in depriving resident aliens from earning a livelihood by fishing in such waters. It has been the uniform policy of this state for many years, as evidenced by numerous legislative enactments, the validity of which, upon the grounds contended for now, have not been heretofore questioned, to limit the right to engage in commercial fishing in the public waters of the state to those only who were citizens of the United States or had declared their intentions to become such and were actual residents of the state or of the adjoining States of Washington or Idaho: See Laws 1891, p. 129; Laws 1898, Sp. Sess., p. 43, §§ 15, 16; Laws 1903, p. 219; Laws 1907, Chap. 73; Laws 1915, Chap. 188; Laws 1919, Chap. 292; Laws 1921, Chap. 105.

4. It is admitted to be a fact that the plaintiff is an alien friend lawfully residing in this state, and that, but for his alienage, he has all of the qualifications requisite to entitle him to the license applied for. Although an alien and having no political rights except those expressly conferred by statute, he is entitled to the benefit of the provision of the federal Constitution that no state shall deprive him of life, liberty or property without due process of law, nor deny to him the equal protection of the laws, as well as to the protection guaranteed by the provision of Section 31 of the state Constitution above quoted. He is entitled to the same protection in all of his

personal rights that he would be entitled to if he were a citizen of the state: 2 Wharton, International Law Digest, § 201; 1 Wharton, Conflict of Laws, § 17. Among these personal rights is the right to engage in any lawful labor, trade, occupation or business within the state and to be protected in his person, reputation and property: 2 C. J., p. 1046. As he is lawfully residing in the state, it follows that he was admitted to the United States under the federal law. Having been so admitted he has the privilege of entering and abiding in the State of Oregon, and, being an inhabitant of the state, he is entitled, under the Fourteenth Amendment, to the equal protection of the laws, which is, in fact, a pledge of the protection of equal laws. The provisions of the "due process" and "equal protection" clauses of the Fourteenth Amendment "are universal in their application to all persons within the territorial jurisdiction without regard to any differences of race, of color or of nationality; and the equal protection of the laws is a pledge of the protection of equal laws." *Yick Wo* v. *Hopkins,* 118 U. S. 356, 369 (30 L. Ed. 220, 6 Sup. Ct. Rep. 1064, see, also, Rose's U. S. Notes); *Wong Wing* v. *United States,* 163 U. S. 228, 242 (41 L. Ed. 140, 16 Sup. Ct. Rep. 977); *United States* v. *Wong Kim Ark,* 169 U. S. 649, 695 (42 L. Ed. 890, 18 Sup. Ct. Rep. 456); *Truax* v. *Raich,* 239 U. S. 33, 39 (Ann. Cas. 1917B, 283, L. R. A. 1916D, 545, 60 L. Ed. 131, 36 Sup. Ct. Rep. 7.) In the last case cited, the court said: "But this admitted authority (referring to the police power of the state), with the broad range of legislative discretion that it implies, does not go so far as to make it possible for the state to deny to lawful inhabitants, because of their race or nationality, the ordinary means of earning a livelihood. It

requires no argument to show that the right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity that it was the purpose of the amendment to secure.''

The operation of this statute results in depriving the plaintiff, merely because of his alienage, of the right to earn a livelihood by engaging in the lawful occupation of commercial fishing within the state, and if the power of the state to enact this law was dependent upon and confined to the exercise of its police powers alone, we are of opinion that the statute would clearly be in violation of the provisions of the federal Constitution to which we have alluded: *State v. Montgomery,* 94 Me. 192 (47 Atl. 165, 80 Am. St. Rep. 386); *Templar v. Mich. State Bd. of Ex. of Barbers,* 131 Mich. 254 (90 N. W. 1058, 100 Am. St. Rep. 610); *Truax v. Raich,* 239 U. S. 33 (Ann. Cas. 1917B, 283, L. R. A. 1916D, 545, 60 L. Ed. 131, 36 Sup. Ct. Rep. 7, see, also, Rose's U. S. Notes).

5, 6. No rule of international law is more firmly established than that the territory of a sovereign state includes the lakes, seas and rivers entirely enclosed within its limits: See Wheaton, International Law (5th Eng. ed.), p. 305; 1 Wharton, International Law, § 30. While the Columbia River, forming the boundary, as it does, between the two coterminous States of Oregon and Washington, is not entirely inclosed within the limits of the state, yet each state, by mutual compact entered into between them and sanctioned by Congress (see *Union Fishermen Co. v. Shoemaker,* 98 Or. 569 (193 Pac. 476, 194 Pac. 854), has concurrent jurisdiction over all parts of the river involved here, and the rights and powers of this state, for the purposes of this case, are the same as if

111 Or.—24

the river were all inclosed within the territorial limits of the state. Hence, while the waters of the Columbia River are open for all purposes of navigation, nevertheless, for the purpose of concurrently regulating fishing in the waters thereof by the two states, the ownership of the soil and jurisdiction in the bed of the river under its tide waters are, for that purpose and agreeably to said compact, as much vested in either state as if the river flowed wholly within that state and not between two coterminous states.

It is also settled by the decisions of the courts, both federal and state, that the "absolute property in and dominion and sovereignty over, the soils under the tide waters in the original states were reserved to the several states, and that the new states since admitted have the same rights, sovereignty and jurisdiction in that behalf as the original states possess within their respective borders." *Knight* v. *United States Land Assn.*, 142 U. S. 161, 183 (35 L. Ed. 974, 12 Sup. Ct. Rep. 258, see, also, Rose's U. S. Notes); *Monroe* v. *Withycombe*, 84 Or. 329 (165 Pac. 227), and cases there cited.

7. The right to fish in the open seas is common to the citizens of all nations: 3 Wharton, International Law Digest, § 299. But the right to fish in the territorial waters of any state or nation, unless modified by treaty, is vested exclusively in the inhabitants of such state or nation. The title to and ownership of the fish in the tidal waters of the State of Oregon, until caught or reduced to possession, are in the state, not in its proprietary, but in its sovereign capacity for the benefit in common of its own citizens: *State* v. *Hume,* 52 Or. 1 (95 Pac. 808); *Portland Fish Co.* v. *Benson,* 56 Or. 147 (108 Pac. 122); *Monroe* v. *Withycombe,* 84 Or. 328 (165 Pac. 227); *State* v.

*Savage,* 96 Or. 53 (184 Pac. 567); *State* v. *Blanchard,*
96 Or. 79 (189 Pac. 42).

Since the state, in its sovereign capacity, has not
only the absolute ownership in and dominion over
the bed and soil which underlies the tidal waters of
the state, but of the waters themselves, subject only
to the public right of navigation, and also has in trust
for its own citizens, title to and ownership of the fish
in such waters, so far as they are capable of owner-
ship while in a state of freedom, it may, through its
legislative power, lawfully limit and restrict the right
to fish to its own citizens and may prohibit citizens of
other states from exercising the right to fish. Such
legislation is not violative of any provision of the
federal Constitution.

A statute of Virginia prohibited any person, not
a citizen of the state, from taking or catching oysters
or shell fish in certain designated tide waters of that
state and from planting oysters therein. This stat-
ute was attacked upon the ground that it violated
the clause of the Fourteenth Amendment which pro-
vides: "No state shall make or enforce any law
which shall abridge the privileges or immunities of
citizens of the United States." In sustaining this
statute, the court, speaking through Mr. Chief Jus-
tice WAITE, said:

"The principle has long been settled in this court,
that each State owns the beds of all tide-waters within
its jurisdiction, unless they have been granted away.
(Citing authorities.) In like manner, the States own
the tide-waters themselves, and the fish in them, so
far as they are capable of ownership while running.
For that purpose the State represents its people, and
the ownership is that of the people in their united
sovereignty. *Martin* v. *Waddell,* 16 Pet. 410. The
title thus held is subject to the paramount right of
navigation, the regulation of which, in respect to

foreign and interstate commerce, has been granted to the United States. There has been, however, no such grant of power over the fisheries. These remain under the exclusive control of the State, which has consequently the right, in its discretion, to appropriate its tide-waters and their beds to be used by its people as a common for taking and cultivating fish, so far as it may be done without obstructing navigation. Such an appropriation is in effect nothing more than a regulation of the use by the people of their common property. The right which the people of the state thus acquire comes not from their citizenship alone, but from their citizenship and property combined. It is, in fact, a property right, and not a mere privilege or immunity of citizenship. * * Following, then, this salutary rule, and looking only to the particular right which is here asserted, we think we may safely hold that the citizens of one state are not invested by this clause of the Constitution with any interest in the common property of the citizens of another state. * * It does not 'belong of right to the citizens of all free governments,' but only to the citizens of Virginia, on account of the peculiar circumstances in which they are placed. They, and they alone, owned the property to be sold or used, and they alone had the power to dispose of it as they saw fit.'' *McCready* v. *Virginia,* 94 U. S. 391 (24 L. Ed. 248).

Since the rendition of this decision it has been held that a state may deny to any person, who is not a citizen of such state, the right to fish in its public waters (*Commonwealth* v. *Hilton,* 174 Mass. 29 (54 N. E. 362, 45 L. R. A. 475); *People* v. *Lowndes,* 130 N. Y. 455 (29 N. E. 751), and may restrict to its own citizens the enjoyment of its game: See *Geer* v. *Connecticut,* 161 U. S. 519 (40 L. Ed. 793, 16 Sup. Ct. Rep. 600); *Patsone* v. *Pennsylvania,* 232 U. S. 138 (58 L. Ed. 539, 34 Sup. Ct. Rep. 281, see, also, Rose's

U. S. Notes); *Commonwealth* v. *Cosick*, 44 Pa. Super. 109; *Commonwealth* v. *Patsone*, 44 Pa. Super. 128.

The fish in the public waters of the state belong to the state in trust for its citizens. The ownership is in the state, not as a proprietor, but in its sovereign capacity, as the representative and for the benefit of all its people in common: *State* v. *Rodman*, 58 Minn. 393 (59 N. W. 1098). Being the common property of the citizens of the state, they do not belong to the plaintiff, who is an alien, nor to any other person who is not a citizen of the state. Resident aliens and citizens of other states have no interest in the fish, nor any right to engage in appropriating them without the consent of the state. As a part of the common property of the citizens of the state, "the rights, immunities and privileges, which are secured by the Constitution of the United States to the inhabitants of the several states, do not include, in favor of inhabitants of any other state, rights in the common property of the inhabitants of other states." *Commonwealth* v. *Hilton, supra.* As said by the court in *People* v. *Crane*, 214 N. Y. 154 (108 N. E. 427): "The power of a state to discriminate between citizens and aliens in the distribution of its own resources is sanctioned alike by decisions of the courts and by long continued practice. Neither aliens nor the citizens of other states are invested by the constitution with any interest in the common property of the people of this state." The statute of this state does not extend to aliens the right to fish in its public waters. On the contrary, in express terms, it requires all persons engaged in catching salmon in the public waters of the state to be licensed, and prohibits the licensing of any person to engage in such fishing who is not a citizen of the United

States and of this state at the time he applies for a license.

8. The fact that the statute, in its operation, prohibits the plaintiff from accepting employment from one lawfully engaged in fishing, and thereby prevents the plaintiff from earning a livelihood in that particular occupation, does not, we think, render the statute unconstitutional. The rights of the state in the fish and in the waters from which the fish are to be taken are superior to plaintiff's right to choose fishing for salmon in those waters for an occupation. Such an occupation is not open to an alien against the legislative will of the state, since it involves the appropriation of property belonging to the state in its sovereign capacity. The state, in prohibiting aliens from engaging in the taking of salmon fish, is dealing with the common property of the people of the state; in prohibiting citizens of other states and unnaturalized foreign-born residents from fishing in the public waters of the state, the state is, in fact, dealing with a property right of the state, and not with a mere privilege or immunity of a citizen of another state, nor does it amount to a denial to an alien within the state of the equal protection of its laws. Under the police power of the state, the legislature may prescribe any terms or conditions reasonably necessary for the preservation of the fish, but in the enactment of this law the legislature was not legislating under its police powers, but under its reserved powers as the owner of the property which was the subject of the legislation and which was to be affected thereby. As such owner it was authorized to prescribe any terms or conditions upon which the property of the state might be converted into private ownership. In legislating to that end it was dealing

with its own property and it had all of the rights and powers of an individual owner subject only to the duties which it owed to its own citizens. The case, in many respects, is analogous to cases arising under statutes prohibiting contractors engaged in public work under contracts with the state or with an agency of the state, from employing aliens upon such public work. This legislation is upheld, not upon the ground that it is an exercise of the police power of the state, but upon the ground that in legislating how the public moneys shall be expended or the state's property be distributed, the state is dealing with its own money and property, and because of that fact the state has a right to prescribe the terms and conditions upon which the property of the state should be distributed or its moneys be expended. The principle upon which such legislation is upheld is stated in *People* v. *Crane, supra,* as follows: "The principle that justifies these discriminations is that the common property of the state belongs to the people of the state, and hence that in any distribution of that property the citizen may be preferred." For other cases recognizing and upholding the power of the state in dealing with its own property or in expending its own money, to make such discrimination in favor of its own citizens and against either aliens or citizens of other states, see *Crane* v. *New York,* 239 U. S. 195 (60 L. Ed. 218, 36 Sup. Ct. Rep. 85, see, also, Rose's U. S. Notes); *Geer* v. *Connecticut, supra; Truax* v. *Raich,* 239 U. S. 33; *Ex parte Gilletti,* 70 Fla. 442 (70 South. 446).

In *State* v. *Catholic, supra,* a statute substantially the same as the statute involved here, denying to citizens of other states the right to fish in the public waters of the state, was held to be not violative of

the "privileges and immunities" clause of the Fourteenth Amendment. Under the federal Constitution there is no provision which accords to foreign-born unnaturalized residents of a state greater rights and privileges than those accorded to citizens of other states. Any contention, therefore, that it is within the power of the legislature to prohibit citizens of other states from fishing in the public waters of the state and that it is not equally within the power of the legislature to prohibit resident aliens from fishing in those waters, is untenable.

In *Atkin* v. *Kansas,* 191 U. S. 207 (48 L. Ed. 148, 24 Sup. Ct. Rep. 124, see, also, Rose's U. S. Notes), it was held to be within the power of a state, as guardian and trustee for its people, and having full control of its affairs, to prescribe the conditions upon which it will permit public work to be done on behalf of itself or its municipalities. That decision upheld the power of the state to enact a statute providing that contractors engaged in public work for the state or for a municipality within the state should not permit an employee on such work to labor in excess of eight hours each day, and imposing a penalty for its violation. The same principle was followed and applied in *Heim* v. *McCall,* 239 U. S. 175 (Ann. Cas. 1917B, 287, 60 L. Ed. 206, 36 Sup. Ct. Rep. 78, see, also, Rose's U. S. Notes). See, also, *Wilson* v. *Gilliam,* 110 Or. 165 (122 Pac. 298), where the same principle was applied in denying liability of a county for material bought for public use where the material did not comply with the positive requirements of the statute and the statute expressly provided that for material which did not conform to the requirements of the statute no liability should attach to the county

upon a contract for its purchase and use by any municipality or governmental agency within the state.

As the right to fish in the public waters of a state is not a right granted or secured to aliens by the Constitution of the United States or by the Constitution of this state, the decree of the Circuit Court must be affirmed.                                    AFFIRMED.