## Ex Parte Bart Blardone.

### No. 4525. Decided January 20, 1909.

**1.—Game Law—Habeas Corpus—Constitutional Law—Police Power.**

The Act of the Thirtieth Legislature, chapter 144, sections 1 and 5, pages 278 and 279, making it a misdemeanor to sell or offer for sale, etc., any of the game or game birds mentioned in section 1 of said Act, such as wild ducks, etc., is constitutional, and does not infringe upon or abridge the right of private property; is not unreasonable or oppressive, etc., but is within the police power of the Legislature. Davidson, presiding judge, dissenting.

**2.—Same—Prohibiting the Sale of Wild Game.**

The same legislative power that has the right to decree that the citizen shall not slaughter game at all, or that he shall kill so many and no more, has the right to make these enactments effective, to enact the further provision that no such sale of such game shall be made at all.

**3.—Same—Wild Game—Property of State—Food Supply.**

Under section 1 of the Act of the Thirtieth Legislature, p. 278, wild game in Texas is the property of the State, and part of the food supply of the State, and the Legislature has not only the authority to regulate the slaughter of such game, but to make such laws as may be necessary to accomplish this purpose, and as may and will defeat evasions and prevent violations of this law.

Appeal from the District Court of Calhoun. Tried below before the Hon. J. C. Wilson.

Appeal from habeas corpus proceedings asking release from commitment charging the relator with the unlawful sale, etc., of wild ducks.

The opinion states the case.

*J. B. Maxey,* for appellant.—Hall v. State, 52 Texas Crim. Rep., 195, 106 S. W. Rep., 149; 2 Kents Com. Sec., 349, p. 339; id., sec. 320, p. 319; Constitution U. S., art. 14, sec. 1; Constitution of Texas, art. 1, sec. 19; Ex parte Brown, 38 Texas Crim. Rep., 295, 42 S. W. Rep., 554; Dilworth v. State, 36 Texas Crim. Rep., 189, 36 S. W. Rep., 275; Ex parte Battis, 40 Texas Crim. Rep., 112, 48 S. W. Rep., 513.

*F. J. McCord,* Assistant Attorney-General, for the State.—Cited cases in opinion.

RAMSEY, Judge.—Relator was arrested in Calhoun County by virtue of a warrant issued on complaint and information filed, charging him, in substance, with the unlawful sale, and offer to sell, of two wild ducks, and that he had same in his possession, and sold said ducks to one Fred Montier. Thereupon he made application to the Honorable J. C. Wilson, Judge of the District Court of

Calhoun County, for writ of habeas corpus. On a hearing before said judge he was remanded to the custody of the sheriff to await trial in the County Court of Calhoun County on the information therein filed against him. Thereupon he prosecutes an appeal to this court, and rests the appeal, substantially, on the proposition that the act of the Legislature making the sale of wild game not in the closed season unlawful, is unconstitutional and void.

The agreed statement of facts shows that on the day charged the relator had in his possession for the purpose of sale and offer for sale, and did sell to one Fred Montier in Calhoun County, two wild ducks, which had been killed by him on said day, and that during this day he did not kill more than twenty-five wild ducks; that these ducks so killed and sold were game birds and came within the purview of the Act of the Thirtieth Legislature, Chapter 144, secs. 1 and 5, pages 278 and 279, and that having said wild ducks in his possession for the purpose of sale and offering same for sale, and selling same, was prohibited by said act of the Legislature and made by law a misdemeanor; that his arrest was by virtue of a capias based on a valid complaint and information, and he had been duly arrested by the sheriff of Calhoun County, was at the date of the trial and had been continuously since his arrest in the custody of the sheriff, and was still in custody.

While relator, in his brief, discusses a number of questions, some of which were more or less academic, the substantial proposition on which the case is rested is, "that the right to alienate property is a natural and necessary consequence to the ownership of property, and is a fundamental right and privilege guaranteed by the Constitution of the United States and of the State of Texas, and any law passed by the Legislature infringing or abridging this right is unconstitutional and void." And further, "The act of the Thirtieth Legislature, Chapter 144, and especially sec. 5 of said act, relating to the protection of game, is unreasonable and oppressive, and is an invasion of the fundamental rights and privileges of the citizens of this State and has no real or substantial relation to the object for which said act was passed, and is in effect a species of class legislation." We think that neither of these propositions can be sustained or that there is any valid objection to the law in question; that whatever may be thought as to its wisdom, its constitutionality is removed from the plane of serious attack or question. The general doctrine is well stated in 19 Cyclopedia of Law and Procedure, p. 1006. The rule is there thus laid down: "It is well established that by reason of the State's control over fish and game within its limits, it is within the police power of the State legislature, subject to constitutional restrictions, to enact such general or special laws as may be reasonably necessary for the protection and regulation of the public's right in such fish and game, even to the extent of restricting the use of or right of property in the game after it is taken or

killed; and such statutes have been enacted in probably all jurisdictions. In England, Canada and the British provinces this power is in their respective parliaments or legislatures." Again, it is stated, "statutes have been enacted and held constitutional in most jurisdictions making it an offense and prescribing a penalty for any person to take or to kill or to have in his possession certain kinds of fish or game or any part thereof during a particular season of the year, commonly called the close-season, or as to certain game for a certain number of years, and as to some game, at any time, without a license. Statutes have also been enacted and held constitutional in some jurisdictions making it an offense to sell, offer for sale, or to have in possession for sale, certain fish and game during the close-season, or as to some game at any time; and these statutes have been held to apply, although such fish and game were acquired lawfully, or, under some statutes, without any wrongful knowledge or intent; and even though imported from another State or country." This precise question has never been before our court as here presented, but it has been before the courts of many of our States and before the Supreme Court of the United States quite frequently, and in every instance, so far as we have discovered, the law has been upheld.

The game law as passed by the Act of the Thirtieth Legislature, in section 1, in substance, declares that wild game in Texas is the property of the State. Such a legislative declaration has been approved and upheld in the cases of Geer v. Conn., 161 U. S., 519; Muel v. Peo., 198 Ills., 258; State v. Shattuck, 104 N. W., 719, and McConnell v. McKillip, 99 N. W., 505. Such legislation has also been upheld in the Supreme Court of the United States, rendered only two weeks ago (Silz v. Hesterberg, vol. 29, p. 1, Supreme Court Reporter), wherein the Supreme Court held that it was not legal to have in one's possession game which was lawfully killed in another State, the possession of which was declared unlawful at the place where the game was stored. Thus holding, in effect, that the State can impose conditions upon which its game may be taken; and one of these conditions may be that the game so taken may not be sold. See also Ex parte Prince, 30 S. W. Rep., 722; People v. Boothe, 86 N. Y., 272. In those cases it is held, among other things, that the nontransportation of game may be a lawful condition to its capture and the State may ordain that its game shall not be transported outside of the State where killed. The same question, in effect, was also ruled to this same substance in the case of People v. Hagan, 72 Pacific, 826; and State v. Heger, 93 S. W. Rep., 252. The last named case is a well considered opinion by the Supreme Court of Missouri, where the matter is exhaustively considered and the history of such legislation is discussed at great length.

In that case, Presiding Judge Burgess of that great court, says: "The authorities are uniform in holding that the absolute ownership

of wild game is vested in the people of the State, and that such is not the subject of private ownership. As no person has in such game any property rights to be affected, it follows that the Legislature, as the representative of the people of the State, and clothed by them with authority to make laws, may grant to individuals the right to hunt and kill game at such times, and upon such terms, and under such restrictions as it may see proper, or prohibit it altogether, as the Legislature may deem best. Haggerty v. Ice Manufacturing & Storage Co., 143 Mo., 238, 44 S. W., 1114, 40 L. R. A., 151, 65 Am. St. Rep., 647; Geer v. St. of Conn., 161 U. S., 519, 16 Sup. Ct., 600, 40 L. Ed., 793; American Express Co. v. People, 133 Ill., 649, 24 N. E., 759, 9 L. R. A., 138; 23 Am. St. Rep., 641; Ex parte Maler, 103 Cal., 476, 37 Pac., 402, 42 Am. St. Rep., 129; State v. Rodman, 58 Minn., 393, 59 N. W., 1098; Magner v. People, 97 Ills., 320; Phelps v. Racey, 60 N. Y., 10, 19 Am. Rep., 140. As it is shown by the agreed statement of facts that defendant had in his possession in the city of St. Louis, and sold to E. W. Kuchans on the 27th day of June, 1905, all of the game birds mentioned in the information, he was guilty of the violation of the law, it matters not that the birds, except the quail, were killed in and shipped to defendant from other States, unless it be shown that his constitutional rights are violated by the act in question.

"In the leading case upon this subject (Geer v. Connecticut, 161 U. S., 519, 16 Sup. Ct., 600, 40 L. Ed., 793) Mr. Justice White, says: 'From the earliest traditions the right to reduce animals ferae naturae to possession has been subject to the control of the lawgiving power.' In speaking of this power, in Haggerty v. Ice Mfg. & Storage Co., supra, Sherwood, J., said, 'The exercise of this power has been definitely traced back even as far as the time of Solon, who forbade the Athenians to kill game. And in France as early as the Sallic law, the right to reduce a part of the common property in game to possession, and consequent ownership, was regulated by law. Such regulations prevailed in every country in continental Europe and in England. Treating of this subject, Blackstone says: 'There still remains another species of prerogative property, founded upon a very different principle from any that have been mentioned before— the property of such animals *ferae naturae* as are known by the denomination of 'game,' with the right of pursuing, taking and destroying them, which is vested in the king alone, and from him derived to such of his subjects as have received the grants of a chase, a park, a free warren, or free fishery. . . . In the first place, then, we have already shown, and, indeed, it can not be denied, that by the law of nature every man, from the prince to the peasant, has an equal right of pursuing and taking to his own use all such creatures as are ferae naturae, and therefore the property of nobody, but liable to be seized by the first occupant, and so held by the imperial law even so late as Justinian's time. . . . But it follows,

from the very end and constitution of society, that this natural right, as well as many others belonging to a man as an individual, may be restrained by positive laws enacted for reasons of State or for the supposed benefit of the community.' 2 Bl. Com., 410.  This prerogative of the king as an attribute of government, recognized and enforced by the common law of England by appropriate and oftentimes by severe penalties and forfeitures, was vested in the colonial governments of this country, and when those governments threw off the yoke of the mother country, that right of sovereignty passed to and was vested in the respective States.  This sovereign attribute and power as existent in the States of this Union has often been exercised by them by passage of laws in the most of these States for the protection and preservation of game, and it seems never to have been called in question.  Numerous adjudications attest this fact.  In such cases the common ownership of game, which otherwise would remain in the body of the people is lodged in the State, to be exercised like all other governmental powers in the State in its sovereign capacity, to be exercised in trust for the benefit of the people, and subject, of course, to such regulations and restrictions as the sovereign power may see fit to impose.  Such regulations appropriately fall within the domain of the police power of the State."

Again, substantially the same question was before the Supreme Court of the United States in the case of New York ex rel. August Silz v. Hesterberg, in error to the Supreme Court of New York, vol. 29, No. 1, Supreme Court Reporter.  In that case relator had imported from abroad one golden plover and also one imported black cock.  In the opinion the Supreme Court refers with approval to the case of Geer v. Connecticut, supra, and as a result of a full discussion and analysis of the case, lays down the rule in this language:  "The power of a State to protect, by adequate police regulations, its people against the adulteration of articles of food (which was, in that case maintained), although in doing so commerce might be remotely affected, necessarily carries with it the existence of a like power to preserve a food supply which belongs in common to all the people of the State, which can only become the subject of ownership in a qualified way, and which can never be the object of commerce except with the consent of the State, and subject to the conditions which it may deem best to impose for the public good." This opinion is not altogether in harmony with the views indicated in the case of Hall v. State, 52 Texas Crim. Rep., 195, 106 S. W. Rep., 149, in which Judge Davidson uses this language:  "We deem it hardly necessary, in the attitude of the case, to decide the question of the authority of the Legislature to authorize a party to catch fish and reduce them to his possession, and acquire ownership and property in them, and then punish the party for the sale of such fish.  In the opinion of the writer, the Legislature would hardly

have such authority. After it became his property, and it was acquired as authorized by the Legislature, it would occur to the writer that the party would have a right to dispose of his property. That the Legislature is clothed with authority to protect game and fish in order to prevent their destruction is a sound proposition. That they may limit the manner of taking the fish to the ordinary hook and line, or by means of the trot line, is in line with the same thought, but how it could be a protection to fish or game to prohibit their sale after they are taken from the water and reduced to possession and ownership, the writer does not understand. There may be a proper exercise of police power in limiting the manner of catching, and the Legislature might even go further, and limit the amount to be caught, and this would be a protection equally with the manner and means as to how they should be caught; but a different question is involved, as the writer understands it, in regard to the prohibiting of a sale where the party has legitimately taken the fish. These, however, are but the views of the writer." We think the vice of this view rests in the fact that fish and game, being by legislative enactment and declaration the common property of the whole people and part of the food supply of the State, the Legislature has not only the authority to regulate the slaughter of such game, but to make such laws as may be necessary to accomplish this purpose and as may and will defeat evasions and prevent violations of this law. "Lead us not into temptation, but deliver us from evil" is not only a suggestion of the Holy Writ as a form of supplication, but not infrequently forms a part of legislation. The limit to which game may be killed is already very large. If no profit results to the sportsman he may well be trusted to limit the spoil of his gun to the number allowed by law. If he may make merchandise of game, there is a constant temptation to kill indiscriminately, and in view of the difficulty of ascertaining what is being killed, it would doubtlessly lead in practice to frequent, continuous and shameless violations of the law. The same power that has the right to send out the decree that the citizen shall not slaughter game at all, or that he shall kill so many and no more, has the right, to make these enactments effective, to enact the further provision that no sale of such game shall be made at all. If the Legislature can, for nine months in the year, prevent either the sale or slaughter of game, can it not, for the better protection of game, limit the sale for the entire year? We think there can be no escape in logic or reason from this view.

We have thus discussed the question at some length, not that we believe there is any difficulty in its proper solution, but, as there has been some difference and doubt in the decisions of the inferior courts, it has been thought best in authoritative decision to give some reference to the sources where a correct rule may be found. Believing the action of the District Court was wholly in accordance

with law, the judgment of the court below is in all things affirmed and relator remanded into custody.

*Relator remanded to custody.*

DAVIDSON, PRESIDING JUDGE (dissenting).—Having differed with my brethren with reference to the disposition of this case, I have concluded to make a few observations why I have done so.

The case and the propositions involved are perhaps sufficiently stated in the main opinion without repetition here. In Hall's case, 52 Texas Crim. Rep., 251, I indulged some observations as individual views in regard to that phase of the game and fish law which prohibits the captor of such game and fish from disposing of them by sale. My brethren saw proper to quote those views and hold them incorrect. After reviewing those statements I am yet firmly convinced of their correctness. I stated then and concede now the authority of the State to protect game and fish from destruction. It is not my purpose to discuss the extent to which legislative authority may go in such protection. The proposition I assert here and now is that when the Legislature authorizes the killing of game by the citizen, and when the citizen reduces such game to possession it becomes his property and he acquires in it the same property rights that he does in any other property he may own. The law under consideration authorizes the killing of not exceeding twenty-five ducks each day during a specified season, but prohibits the slayer of such game from selling any number thereof. It may be accurately stated that under the terms of this law the number of duck is authorized to be taken only as food and not with or for the purpose of destruction. Any other reason would seriously reflect upon the legislative body. The law was intended to protect such game from useless and capricious slaughter. As before stated, it is now universally held under such game laws that the reduction to possession of the therein mentioned game vests the title in the captor and it becomes his property. Those laws limit the time of killing game, and this is termed the "open season." Other seasons of the year are classed as "closed season" during which game can not be taken or shipped. Such laws have been maintained as valid to the extent of prohibiting shipment of game during the "closed season," though the game was taken during the "open season." Many of the cases are cited by my brethren in the opinion in this case. The leading cases relied upon by my brethren, I have read. The Missouri case, Geer v. Connecticut and Silz v. Hesterberg are by them mainly relied upon. These cases deal with the question of interstate shipment. I do not care to enter that field here for the question is not even remotely involved in this case. Those cases support the doctrine that the States have the authority to prohibit the transportation of game beyond their borders when slaughtered within their territorial lines without infringing the doctrine of interstate commerce. While I concur with the views

of Justices Fields and Harlan expressed in their dissenting opinions, yet, with that question, I have no concern as it is not in the slightest involved in this case. The question here is, can the Legislature prohibit the citizen from the disposition of his legally acquired property, when that sale or disposition is confined within the state where acquired during the open season? I am firmly convinced the question is correctly to be answered in the negative. There is nothing contained either in the Missouri case or in Geer v. Connecticut which contravenes this view and a careful scrutiny of Silz v. Hesterberg tends, in my judgment, to support the conclusion I have reached. I believe that Geer v. Connecticut also supports my position, and unquestionably the dissenting opinions in that case clearly does support my views. In the main opinion in Geer v. Connecticut this language is found. "The foregoing analysis of the principles upon which alone rests the right of an individual to acquire a qualified ownership in game, and the power of the State, deduced therefrom, to control such ownership for the common benefit, clearly demonstrates the validity of the statute of the State of Connecticut here in controversy. The sole consequence of the provision forbidding the transportation of game killed within the State, beyond the State, *is to confine the use of such game to those who own it, the people of that State.* The proposition that the State may not forbid carrying it beyond her limits involves, therefore, the contention that a State can not allow its own people the enjoyment of the benefits of the property belonging to them in common, without at the same time permitting the citizens of other States to participate in that which they do not own." Mr. Justice White in that opinion emphasizes the fact that game is held for the benefit of the people of the particular State to the exclusion of those of another State, and sustains the proposition that the home State can interdict shipment to another State. The case *does not hold that sale could be prohibited among the citizenship of the home State,* but as I understand that decision as well as that in Silz v. Hesterberg, the contrary doctrine is strongly intimated. *The game mentioned is only authorized to be slain for food and not for shipment as an interstate commercial commodity.* If I am incorrect, why authorize the killing of twenty-five ducks each day? The slayer could not possibly consume as food twenty-five ducks, and it was certainly not intended to encourage the slaying of the twenty-five ducks to be thrown away, and confer no food benefit upon anybody but the captor. *The law was intended for protection against useless slaughter and destruction, and not for the encouragement of such slaughter.* The law should be so construed as to protect the game from useless slaughter, and yet keep in sight the reason for the killing, to wit: a food supply. While the slayer might be "led into temptation to reimburse himself for the expenditure in taking the game, yet it is far bet-

ter that he should not yield to the graver "temptation" of *wasteful and useless destruction*. I rather incline to the conclusion, however, that my brethren have gone far afield of the real situation when they color the legislative intent with the quotation from the Lord's Prayer. I find nothing on the face of the law indicating such legislative devotional frame of mind.

Nor am I ready to agree altogether with my brethren in their contention of the unlimited power of the Legislature to authorize the killing of game, and yet prohibit its thereafter legitimate use, though that use involves a sale of the captured game. The inhibition of the sale is arbitrary and unreasonable. Such a law, in my judgment, is violative of even the widest stretch of police power.

In Silz v. Hesterberg, 211 U. S. Rep., at p. 39, this language is found: "That the Legislature of the State is not the final judge of the limitations of the police power, and that such enactments are subject to the scrutiny of the courts and will be set aside when found to be unwarranted and arbitrary interferences with rights protected by the Constitution in carrying on a lawful business or making contracts for the use and enjoyment of property, is well settled by former decisions of this court. Lawton v. Steele, 152 U. S., 133, 137; Holden v. Hardy, 169 U. S., 366; Dobbins v. Los Angeles, 195 U. S., 233, 236." It is further said: "In order to protect local game during the closed season it has been found expedient to make possession of all such game during that time, whether taken within or without the State, a misdemeanor. In other States of the Union such laws have been deemed essential, and have been sustained by the courts. Roth v. State, 51 Ohio St., 209; Ex parte Maier, 103 California, 476; Stevens v. State, 89 Maryland, 669, Magner v. The People, 97 Illinois, 320. It has been provided that the possession of certain kinds of game during the *closed season* shall be prohibited, owing to the possibility that dealers in game may sell birds of the domestic kind under the claim that they were taken in another State or country. The object of such laws is not to affect the legality of the taking of game in other States, *but to protect the local game in the interest of the food supply of the people of the State.*" It was again said, quoting Geer v. Connecticut, that: "Aside from the authority of the State, derived from the common ownership of game and the trust for the benefit of its people which the State exercises in relation thereto, there is another view of the power of the State in regard to the property in game, which is equally conclusive. The right to preserve game flows from the undoubted existence in the State of a police power to that end, which may be none the less efficiently called into play, because by doing so interstate commerce may be remotely and indirectly affected, citing Kidd v. Pearson, 128 U. S., 1;

Hall v. De Cuir, 95 U. S., 485; Sherlock v. Alling, 93 U. S., 99, 103; Gibbons v. Ogden, 9 Wheat., 1. *Indeed, the source of the police power as to game birds (like those covered by the statute here called in question) flows from the duty of the State to preserve for its people a valuable food supply.* Phelps v. Racey, 60 N. Y., 10; Ex parte Maier, 103 California, 476; Magner v. The People, 97 Illinois, 320, and the cases there cited." If the fundamental proposition is correct, as asserted by all these opinions, that the exercise of police power in regard to game is in the interest of the *people of the State as a common food supply,* then it may well be asked how, after this food or game has been reduced to possession, it can be used as food for the people generally of the country when the sale and distribution of it is interdicted. The statute authorizes the killing of twenty-five ducks, but prohibits the sale of a single one of the number. Certainly, it would not be contended that the hunter who kills twenty-five ducks would be expected to eat that number, because the law authorizes the killing of that number every day. If so, the hunter would be in the sad dilemma of throwing away his game, or of eating the entire number slain or captured. This construction would mean destruction, uselessly so, and for food supply. It is well known as a matter of common every day knowledge in the history of our people that only a very limited number of our people indulge in the sport of hunting, and I think it may be as safely asserted that on the day of such sport, the sportsman will exercise his power to capture the limit, and this he could legally do each day of the open season. It is as well known that the great mass of our people do not hunt, having neither the opportunity, time, nor inclination, therefore they must rely upon the markets for their supply of game. The number of ducks not consumed by the captor must then be thrown away and permitted to decay so far as this law is concerned as construed, when if the object of the protection of the game as a food supply is to be carried out, the ducks in excess of those used by the captor would find their way to the table and enjoyment of the remainder of the community in accordance with the object of such laws, to wit: food supply. It occurs to me that if the Supreme Court of the United States is correct in saying that the exercise of this police power should be reasonable and not absurd, it would find pertinence in its application here, and I could not well conceive of a greater absurdity in the law than this contention, to wit: the useless destruction of twenty-five ducks, or simply for sportive gratification of the slaying huntsman.

It is to be noted in the authorities quoted by my brethren there is a broad distinction between taking game in what is termed the "open season" and that called the "closed season." The Missouri case and Silz v. Hesterberg, deal with the game held in possession during the closed season; that is, the season when the game cannot

be taken. Under these decisions game captured in the open season, or time authorized in which they can be taken, is prohibited from shipment during the closed season or time when game cannot be captured, but for the first time so far as I am aware, it is now held that game authorized to be taken in the "open season" is prohibited where taken to be sold in the "open season" to the citizenship of that State to be used as food. It is plainly to be seen that the authorities cited in the main opinion have no relevancy or bearing upon this question. The police power is a wonderful power, and it seems to constitute the refuge for doubtful decisions when a real tangible reason cannot be given. When the term police power is used a field unknown is entered, but fortunately the courts have begun to curtail the wonderful and aggressive reach of this power as exercised by legislative authority to within reasonable lines. Certainly no law ought to be upheld, the provisions of which is absurd, unjust or oppressive.

I, therefore, thus crudely enter my protest and dissent from the conclusions reached by my brethren.