Allen, J.
 

 This application for a peremptory writ of mandamus arises under Section 1436 of the General Code, the pertinent portions of which are as follows:
 

 “It shall be lawful for any citizen of the state of Ohio to engage in the business of raising and selling domesticated English ringneck or Mongolian or Chinese pheasant, mallard or black ducks, on the lands on which he is the owner or lessee. Any citizen desiring to engage in the propagation of the birds herein mentioned, shall make application in writing to the secretary of agriculture for a permit, and when it shall appear that such apjjlication is made in good faith, and upon the payment of a fee of five dollars shall be' granted a breeder’s license, permitting such applicant to breed and
 
 *81
 
 raise for commercial purposes the birds above enumerated, under the regulations herein set forth.
 

 “*
 
 * * Any licensee or person having written permission may kill or sell either dead or alive the birds herein enumerated in accordance with the provisions set forth, at any time, and the birds so killed may be bought and sold as hereinafter stated. * * * No pheasant * * * shall be killed by shooting except during the open season for such birds, or except as provided by this section.”
 

 The relator is seeking a breeder’s license to permit him to breed and raise English ringneck, Mongolian, and Chinese pheasants for commercial purposes. In his testimony, however, he admits that he proposes to get his return for his trouble by selling hunting privileges, and that in this year, and in 1924 and 1925, the exclusive hunting privilege on his farm has been let to J. H. Lytle, of Dayton, Ohio. He does not claim that he ever has sold or ever intends to sell individual birds or eggs.
 

 The questions raised upon the petition, answer and testimony taken by the master commissioner are, firstly, that Section 1436 is not constitutional, in that it constitutes a violation of the due process clause of Article XIY, Section 1, of the federal Constitution; and, secondly, that the relator makes the application for a license in good faith, and, since the fee required under the statute has been tendered, he is clearly entitled to the issuance of this writ.
 

 Wé
 
 have little sympathy with the claim that this statute is unconstitutional. Pheasants, although at times domesticated, are game birds in this country, and it is within the police power of the state to
 
 *82
 
 regulate the hunting and killing of game birds. It is stated in 12 Ruling Case Law, 691, that “there is no dissent from the general proposition that the state has the authority to make regulations tending to conserve the game within its jurisdiction.”
 

 See
 
 Lawton
 
 v.
 
 Steele,
 
 152 U. S., 133, 14 S. Ct., 499, 38 L. Ed., 385;
 
 Geer
 
 v.
 
 Connecticut,
 
 161 U. S., 519, 16 S. Ct., 600, 40 L. Ed., 793;
 
 Ward
 
 v.
 
 Race Horse,
 
 163 U. S., 504, 16 S. Ct., 1076, 41 L. Ed., 244;
 
 Ex parte Maier,
 
 103 Cal., 476, 37 P., 402, 42 Am. St. Rep., 129;
 
 Harper
 
 v.
 
 Galloway,
 
 58 Fla., 255, 51 So., 226, 26 L. R. A., (N. S.), 794, 19 Ann. Cas., 235;
 
 In re Schwartz,
 
 119 La., 290, 44 So., 20, 121 Am. St. Rep., 516;
 
 State
 
 v.
 
 Snowman,
 
 94 Me., 99, 46 A., 815, 50 L. R. A., 544, 80 Am. St. Rep., 380;
 
 State ex rel. Corcoran
 
 v.
 
 Chapel, Sheriff,
 
 64 Minn., 130, 66 N. W., 205, 32 L. R. A., 131, 58 Am. St. Rep., 524;
 
 McConnell
 
 v.
 
 McKillip,
 
 71 Neb., 712, 99 N. W., 505, 65 L. R. A., 610, 115 Am. St. Rep., 614, 8 Ann. Cas., 898;
 
 People ex rel. Hill
 
 v.
 
 Hesterberg, Sheriff,
 
 184 N. Y., 126, 76 N. E., 1032, 3 L. R. A., (N. S.), 163, 128 Am. St. Rep., 528, 6 Ann. Cas., 353; affirmed
 
 New York ex rel. Silz
 
 v.
 
 Hesterberg, Sheriff,
 
 211 U. S., 31, 29 S. Ct., 10, 53 L. Ed., 75;
 
 State
 
 v.
 
 Hanlon,
 
 77 Ohio St., 19, 82 N. E., 662, 13 L. R. A., (N. S.), 539, 122 Am. St. Rep., 472;
 
 Ex parte Blardone,
 
 55 Tex. Cr. R., 189, 115 S. W., 838, 116 S. W., 1199, 21 L. R. A., (N. S.), 607.
 

 Since the state has control of the game within its limits, the Legislature has the power to enact such laws as may be reasonable or necessary to protect the public rights in such game. Whatever rights the relator may have with reference to such game are subject to the police power of the state, and must be exercised in accordance with the statute.
 
 *83
 
 The contention of the relator that the statute in question is unconstitutional is therefore overruled.
 

 Holding that the statute is valid, we next inquire whether under its provisions the relator is entitled to the writ prayed for.
 

 Section 1436, above quoted, places it within the discretion of the secretary of agriculture to decide whether or not the application is made in good faith, and to refuse the license if the application is not made in good faith. If the secretary of agriculture exercises that discretion soundly, this court will not by mandamus interfere to control his discretion.
 

 We therefore proceed to consider whether the secretary of agriculture acted in the exercise of a sound discretion when he decided that the relator did not make his application in good faith.
 

 A careful consideration of the evidence taken before the master commissioner which includes the relator’s testimony as to his method of breeding pheasants and Ms purpose in making the application, together with the detailed explanation of the secretary of agriculture why the application was refused, discloses evidence’ tending to establish that the relator has no adequate facilities to raise and breed pheasants upon Ms premises; that he does not know how many pheasants are on Ms premises; that he has only the ordinary farm fences surrounding his farm; and that such fences are not generally used in the propagation of pheasants, a much higher fence being reqMred. It appears that, upon learning that the relator’s application was not approved by the fish and game supervisor of the district, nor by the fish and game protector of Clinton county, nor by
 
 *84
 
 the officer or officers of the fish and game association of Clinton county, the secretary of agriculture made an extended investigation. From his investigation, as shown by. the record, he received information which gave him reason to believe that, although the relator had in previous years stated to the contrary, he has never himself at any time purchased any pheasants’ eggs or any pheasants; that he has in the past years, when he was licensed for breeding pheasants for commercial purposes, never raised any pheasants for commercial purposes; that he has made the most superficial study of the propagation of pheasants, if indeed he has studied the subject at all; that he has never sold any pheasants, nor any pheasants ’ eggs; that he cannot distinguish the few domesticated pheasants which he claims to own from those existing in a wild state upon his premises, and that he has permitted the same J. H. Lytle, to whom he has leased hunting privileges upon his land, to shoot pheasants, both cocks and hens, upon his land during the closed season.
 

 The record also shows that the relator’s farm is not inclosed with a fence that will retain the birds that he proposes to breed and rear, so that the pheasants which are propagated by the state at considerable expense (amounting to approximately $95,000 in the past four years) and set free by the state in the woods and fields of Ohio cannot be separated from his own birds. Hence it would be impossible for any one to shoot pheasants on Collett’s territory and be sure whether he was shooting pheasants reared on that farm or pheasants that had been released by the state. This is not,
 
 *85
 
 therefore, the case where a man upon his own land breeds such birds, and confines them in pens, so that he can identify them as his own property. It is not the case where a man on his own land shoots birds which he himself has raised, either for eating or for selling.
 

 It is evident from the record that the relator desires a breeder’s license merely so that he can sell the privilege of hunting upon his land, during the closed season, to J. H. Lytle, and for no other reason. The fundamental purpose of the enactment of Section 1436, however, is not that game birds may be shot within the closed season on private shooting grounds. The purpose of the statute is that these particular birds may be raised and domesticated and used commercially. But if the birds are not confined or otherwise identified they cannot be used commercially. The statute is perfectly clear in this particular. While the phrasing might have been more apt, the provision that the licensee may kill or sell dead or alive birds at any time is inserted in the statute for the express purpose of allowing a licensed applicant to raise these birds and to dispose of such as belong to him, that is, such as he can identify as his own, for commercial purposes. This purpose is further emphasized by the sentence of the section which provides that no pheasants shall be killed by shooting “except during the open season for such birds, or except as provided by this section.” In other words, the statutes did not contemplate the killing of birds raised by the state or of birds at large in a wild state during any but the open season.
 

 If the contention of the relator is established,
 
 *86
 
 this state could be organized into private hunting preserves. Since Section 1436 refers to domesticated pheasants, it is evident that it was not the intent of the Legislature to provide for the establishing of hunting preserves in accordance with the system of the English gentry, but to provide for the raising and selling of domesticated pheasants, as distinguished from wild pheasants in the forests and fields of the state. Obviously, if a landowner wishes to kill domesticated pheasants during the closed season, he must fence and segregate his own birds so as to make it possible, to distinguish them from similar wild birds with which the state has stocked our woods and fields.
 

 ‘ ‘ Mandamus is a writ commanding a public board or official to perform an act which the law specially enjoins as a duty resulting from an office, trust or station, and will issue only when it is clearly shown that there is a plain dereliction of such duty.”
 
 State ex rel. Van Harlingen
 
 v.
 
 Board of Education,
 
 104 Ohio St., 360, 136 N. E., 196.
 

 Mandamus will not issue to control discretion unless it be clearly shown that the refusal by the one occupying the trust or station to perform the desired act is an abuse of discretion.
 
 Board of Education
 
 v.
 
 State ex rel. Wickham,
 
 80 Ohio St., 133, 88 N. E., 412.
 

 Since the secretary of agriculture has acted in the exercise of an eminently sound discretion in the refusal of the license, the writ will be denied.
 

 Writ denied.
 

 Marshall, O. J., Day, Kinkade, Robinson, Jones and Matthias, JJ., concur. .