## OHIO DIVISION OF WILDLIFE

v.

## CLIFTON.

Circleville Municipal Court,
Pickaway County.

No. 97CRB1458.

Decided Dec. 23, 1997.

*Gary Kenworthy,* Circleville Law Director, for plaintiff.

*Stephen S. Gussler,* for defendant.

JOHN R. ADKINS, Judge.

This matter began October 20, 1997, when Officer Kenneth Bebout filed a misdemeanor complaint against the defendant alleging that she did "unlawfully have a game quadruped to wit; a squirrel in captivity without applying for or possessing a game propagating license from the Ohio Division of Wildlife, a violation of 1533.71 of the Ohio Revised Code." Attached to that complaint is a narrative statement of Officers Bebout and Brown, after having made contact with Mary Jane Clifton in an attempt to seize a certain grey squirrel, which had been reported in the Circleville Herald after her entry of the animal in the 1997 Circleville Pumpkin Show pet parade. On October 30, 1997, the defendant appeared and through counsel pled not guilty and requested a trial by jury, the offense being classified as a misdemeanor of the third degree. On December 1, 1997, a motion to dismiss was filed by counsel for the defendant. On December 8, 1997, a memorandum opposing the motion to dismiss was filed, and a motion to compel discovery prior to the hearing was approved by the court in order to expedite this matter. On December 18, 1997, a hearing was held pursuant to defendant's motion and in lieu of the arresting officer, Officer Lehman, a Wildlife Division Enforcement Supervisor, testified upon production by the Director of Law for the city of Circleville, Mr. Kenworthy. At that hearing, documents were filed with the court that set forth the following facts, all of which the court is considering. The subject of the controversy is a certain grey squirrel, which was apparently dislodged from its nest shortly after birth. It was discovered by the defendant in this obviously imperiled state. The defendant exercised control over the squirrel, providing nutrition and hydration in such a way that notwithstanding the low potential for survival, the squirrel, in fact, was habilitated and survived. Nearly a year and a half passed, during which time the squirrel remained in the residence of Clifton and became habituated to that environment. Enthralled with the creature, Clifton carried it through the 1997 Pumpkin Show parade and won first prize in the most unusual pet category, thereby garnering the attention of Wildlife Officer Bebout. He and another officer drove to the residence of the

alleged offender and attempted to take into custody this squirrel. Custody was refused by Clifton and she was cited into Circleville Municipal Court, the maximum possible penalty being $500 and sixty days in jail. The section under which she was cited states as follows:

"Any person desiring to engage in the business of raising and selling game birds, game quadrupeds, or fur-bearing animals in a wholly enclosed preserve of which he is the owner or lessee, or *to have game birds, quadrupeds, or fur-bearing animals in captivity, may apply in writing to the Division of Wildlife for a license to do so.*

"The Division when it appears that the application is made in good faith, *shall, upon the payment of the fee for each license, issue to the applicant* such of the following licenses as may be applied for:

"(A) 'Commercial propagating license' permitting the licensee to propagate game birds, game quadrupeds, or fur-bearing animals in the wholly enclosed preserve the location of which is stated in the license and the application therefor, and to sell such propagated games birds, game quadruped, or fur-bearing animals and ship them from the state alive at any time and to kill such propagated game bird, game quadrupeds, or fur-bearing animals and sell the carcasses for food subject to sections 1533.10 to 1533.80 of the Revised Code. The fee for such a license is twenty-five dollars per annum.

"(B) 'Noncommercial propagating license' permitting the licensee to propagate game birds, game quadrupeds, or fur-bearing animals and to hold such animals in captivity. Game birds, game quadruped, and fur-bearing animals propagated or held in captivity by authority of a noncommercial propagation license are for the licensee's own use and shall not be sold. The fee for such a license is ten dollars per annum.

"(C) A free 'raise to release license' permitting duly organized clubs, associations, or individuals approved by the division to engage in the raising of game birds, game quadruped, or fur-bearing animals for release only and not for sale or personal use.

"Except as provided by law no person shall possess game birds, game quadrupeds, or fur-bearing animals in closed season, provided that municipal or governmental zoological parks shall not be required to obtain the licenses provided for in this section." (Emphasis added.)

In response to the issuance of the citation, on November 4, 1997, Clifton made an application for a game propagation permit, which was refused with an annotation at the bottom noting, "squirrel was taken from wild—no permit can be issued for this animal—must be released to the wild."

The court ordered the Division of Wildlife to set forth all written rules, regulations or other documents published by the Division of Wildlife setting out the criteria for the allowance or rejection of applications for licenses contemplated in R.C. 1533.71(A) and 1533.71(B), in addition to other information sought. The Division has no such rules or regulations, but provided copies of Ohio Adm.Code 1501:31–15–09, "Hunting and trapping regulations for fur-bearing animals," the essence of which, according to Officer Lehman, is that an animal listed may be hunted, trapped, taken, or possessed, if immediately thereafter it is put to death by any reasonable means. Further, the department in R.C. 1533.16 has set forth that game birds and wild quadrupeds shall be taken only by hunting with a gun, a gun and dog, a bow and arrow, or a bow, arrow and dog. The implication, of course, is that utilizing such weaponry or hunting dogs, the animal shall be killed forthwith if taken only during the appropriate season as set forth in Ohio Adm.Code 1501:31–15–17. It is clear from Officer Lehman's testimony that had Clifton captured this grey squirrel during the appropriate season and subsequently killed it, she would have committed no wrong, assuming that she had acquired the proper license from the state to engage in such activity. The state's position, therefore, is clear: A person may take any such listed game animal during the appropriate season, having paid the appropriate licensing fee, and kill such animal. That is the only way a person may possess a listed animal, unless pursuant to R.C. 1533.71 a license is issued. However, the state has no criteria by which a person may reasonably be adjudged worthy of or not worthy of possession of a wild animal having been acquired by other means. Therefore, there is no lawful method, according to the Division of Wildlife officers, for a person to (a) properly take a game animal during season, merely wounding the animal, and then resuscitating or rehabilitating that animal; (b) be given an animal by some other person who may have acquired it by a recognized process or otherwise; (c) find an injured, distressed, abandoned or animal otherwise selected through the Darwinian process for death and provide that animal shelter, nutrition and hydration and, hence, life.

There is an exception, in that the Division has apparently selected certain individuals based on their "clinical lack of emotion" to rehabilitate animals, remain emotionally detached from them and attempt to reintegrate those animals into the wild whether there is a potential for success or not.

Notwithstanding that there are no written rules, regulations or guides either for accepting or rejecting licenses by the Division, 1,609 licenses have been granted to other individuals. The Division can provide no explanation of the basis on which the licenses were accepted or rejected. After this case was in progress, Officer Bebout appeared and produced another citation to be filed, alleging that Clifton had violated R.C. 1531.02. The court has not permitted that

citation to be processed because it is an obvious attempt to coerce a defendant during the pendency of litigation and the Director of Law did not approve the filing of that case in writing after the initiation of case No. 97CRB1458A.

There are no cases construing R.C. 1533.71. The court specifically finds that *State ex rel. Collett v. Truax* (1927), 117 Ohio St. 78, 157 N.E. 792, does not apply.

OPINION

ISSUES

■ (a) Time: R.C. 2945.71(B) states that "a person against whom a charge of misdemeanor, other than a minor misdemeanor, is pending in a court of record, shall be brought to trial:

"(1) Within forty-five days after his arrest or the service of summons, if the offense charged is a misdemeanor of the third or fourth degree, or other misdemeanor for which the maximum penalty is imprisonment for not more than sixty days."

The court notes from its records that this matter originated on October 20, 1997. The court tries cases to juries each and every Tuesday throughout the year. Scheduled on each jury trial day are not less than four trials for persons charged with offenses such as operating a motor vehicle while under the influence (typically a multiple offender), domestic violence (typically offenses arising from circumstances of exceptional injury), child endangering, driving under suspension and/or theft. All of these cases involve misdemeanors of the first degree carrying maximum penalties of six months in jail and a $1,000 fine, and typically such cases have more than one charge pending for trial. There is no reasonable prospect that this case will be tried at any time in the near future given the conflicting trials that this court and the legislature perceive as substantially more serious, affecting the health, welfare and safety of both the public at large and particular victims. This problem is not dispositive of this matter, but it is a matter which is considered by the court in its overall review of the circumstances of this particular case.

(b) Rules and Regulations: R.C. 1531.08 sets forth the powers and authority of the Chief of the Division of Wildlife of Ohio. That Revised Code section places with the Chief of the Division authority and control in all matters pertaining to the protection, preservation, propagation, possession and management of wild animals. R.C. 1531.08 states that "[e]ach rule adopted under this section shall clearly and distinctly describe and set forth the waters or area or part thereof affected by the rule and whether that rule is applicable to all wild animals or only to certain kinds of species designated therein.

"The Chief may regulate any of the following:

"(A) taking and possessing wild animals, at any time and place or in any number, quantity, or length, and in any manner, and within such devices as he prescribes."

The court finds that there are no appropriate rules setting forth clearly and distinctly the standards for a person in good faith to satisfy the obvious legislative intent, which includes the preservation of animal life. No one could be so myopic as to believe that the legislature was so ambivalent toward the protection of wild animals as to have legislated an Act that requires, manifestly, that all animals found in whatever location defined under the statute must be thereafter killed or turned over to a clinical rehabilitation specialist, who at best might hope that the animal would survive. The legislature of the state of Ohio expressly set forth that "[a]ny person" "may apply" for a license "to have game birds, game quadrupeds, or fur-bearing animals in captivity." R.C. 1533.71. That language is clear, it is uncontroverted, and it is constitutional. In addition, note that the statute does not say "must" apply. It is, however, arbitrary and capricious for the State Wildlife Division to fail to properly promulgate rules and regulations so that a person in good faith may make such application and be able to readily ascertain from the face of the application the criteria for acceptance and for rejection. As stated in *Kimble Clay & Limestone v. Div. of Reclamation* (June 15, 1995), Tuscarawas App. No. 94AP120093, unreported, 1995 WL 497706:

"Statutes clear in their terms need no interpretation; they simply need application. If the inquiry into language of a statute 'reveals that the statute conveys a meaning which is clear, unequivocal and definite, at that point the interpretative effort is at an end and the statute must be applied accordingly.' *Provident Bank v. Wood* (1993), 36 Ohio St.2d 101, 105-106, 65 O.O.2d 296, 298, 304 N.E.2d 378, 381.

An excellent test of the application of the statute in this case can be found in *State v. Conger* (1994), 97 Ohio App.3d 91, 96, 646 N.E.2d 238, 241:

"In construing a statute, a court's paramount concern is the legislative intent in enacting the statute. *State v. S.R.* (1992), 63 Ohio St.3d 590, 594, 589 N.E.2d 1319, 1322. Under Ohio law, it is a cardinal rule that a court must first look to the language of the statute itself to determine the legislative intent. *Shover v. Cordis* (1991), 61 Ohio St.3d 213, 218, 574 N.E.2d 457, 461; *S.R., supra,* 63 Ohio St.3d at 595, 589 N.E.2d at 1323. In interpreting a statute, words and phrases shall be read in context and construed according to the rules of grammar and common usage. *Indep. Ins. Agents of Ohio, Inc. v. Fabe* (1992), 63 Ohio St.3d 310, 314, 587 N.E.2d 814, 817; R.C. 1.42. Courts do not have authority to ignore the plain and unambiguous language of a statute under the guise of statutory interpretation, but must give effect to the words used. *State ex rel. Fenley v. Ohio Historical Soc.* (1992), 64 Ohio St.3d 509, 511, 597 N.E.2d 120, 122. In

other words, courts may not delete words used or insert words not used. *Cline v. Ohio Bur. of Motor Vehicles* (1991), 61 Ohio St.3d 93, 97, 573 N.E.2d 77, 80."

■ This court does not find the statute unconstitutional or vague. What the court does find is that the application of the statute in this case is unconstitutional because it fails the due process test set forth in *Conger*. First, fair warning must be provided to the ordinary citizen so that behavior can comport with the dictates of the statute. Second, arbitrary, capricious, and generally discriminatory enforcement by officials given too much authority and too few constraints must be precluded. And, third, fundamental constitutional freedoms must not be unreasonably impinged or inhibited. *Id.*, 97 Ohio App.3d at 99, 646 N.E.2d at 243.

The court also notes that no one disputes that Clifton, upon coming into possession of the infant squirrel, contacted the Division of Wildlife and inquired whether there were provisions for her to follow. She had once lived in New York, and she knew that licensing provisions existed there. Upon such inquiry, she was reportedly advised that she need follow no special procedures. Obviously, she relied upon that to her detriment. A citizen should be able to obtain competent advice from a state agency.

(c) Ensurance of Justice: In common law, "justice" was a title given to judicial officers of the King's Bench. It has come to be a term used in the United States to denote not only the individual empowered by the electorate to ensure appropriate checks and balances, but also the constant and perpetual disposition to place all men in equality. In the most expansive sense of the word, "justice" differs little from "virtue," which includes a gamut of Judeo–Christian values. Yet the common distinction between the terms "justice" and "virtue" is that virtue is wholly positive, while justice includes the imposition of punishment to ensure that people live within the law of their jurisdiction. "Justice" is not an abstract thought or concept, but sometimes the essence of justice, which is the common experience of man yielded from common sense, logic and decency, is lost in our society. Even though we charge jurors to apply the test of common sense that we use in our everyday lives, judges and lawyers often become lost in abstract thought and concepts, believing that they should apply statutes blindly. This court takes its obligation and its oath of office much more seriously. It was stated well in *State v. Aldridge* (1997), —— Ohio App.3d ——, —— N.E.2d ——: "No right of the victim is advanced, and no interest of the state served, by incarcerating the innocent." The Supreme Court of Ohio has stated, in a case that the state itself points to, that "a trial before a judicial tribunal is primarily a truth-determining process, and if it in any sense loses its character as such, it becomes the veriest sort of a mockery." *State v. Marinski* (1942), 139 Ohio St. 559, 560, 23 O.O. 50, 51, 41 N.E.2d 387, 388. The ultimate aim of the criminal justice system, then, is not the balancing of rights, but the uncovering of truth.

The court finds that the truth of this case is that a citizen of the state of Ohio attempted to extend humanitarian aid to an otherwise helpless animal. The Wildlife Officer in this case would choose to reward her with a potential fine and incarceration and, obviously, death for the squirrel. Officer Lehman himself testified that the average life expectancy of a squirrel in the wild, due to Darwinian effects of predation and so forth, is eleven months. The court notes that the squirrel has so far survived seventeen. Officer Lehman further testified that the anticipated life expectancy of this squirrel in Clifton's residence is five to seven years. And yet, the state insists on regaining possession of this squirrel to return it to the wild, even though it knows that the animal would not survive. This makes no sense. Even a child could see that there is no justice or right in the position of the state.

Is there a rationale for the underlying statute? Of course! It must be learned from this case that citizens may not arbitrarily take animals from the wild to habituate, tame and otherwise domesticate them, for the obvious reason that the animals may be infected with various serious diseases, and they may pose a potential public safety risk to children and others. Therefore, the statute is logical and its general enforcement may be appropriate. As applied in this case, it is inappropriate.

(d) Definitional Clarity: Officer Lehman argues that this animal is wild. Wild animals by definition are animals of an untamable disposition or animals which are in a state of nature. Ohio Adm.Code 1501:31–1–02 defines "wild animals" as mollusks, crustaceans, aquatic insects, fish, reptiles, amphibians, *wild* birds, *wild* quadrupeds, and all other *wild* mammals. But a term cannot be used to define itself. Officer Lehman in his testimony indicated that the squirrel in this case is a wild animal. He further indicated that it could not survive in the wild because it is not "wild," as it has been habituated to a household. This exemplifies the lack of definitional soundness of the Ohio Administrative Code. This court previously found that the Division of Wildlife's use of the term "snagging" as used in Ohio Adm.Code 1501:31–1–02(RRR) is also inappropriate and requires clarification before it can be applied. For instance, "wild" could easily have been defined as any quadruped, bird or other mammal born in the state of nature. This court believes that this animal is not in fact wild, although it is obviously a grey squirrel. The fact that some individual somewhere wrote on the application of the defendant, "squirrel was taken from wild—no permit can be issued for this animal—must be released to the wild," is a statement of such undeniable idiocy that trying to argue against it nearly defies the capacity of the English language.

This court sees all manner of lamentable activities of mankind against other people and property. Day after day there is an endless parade of people demonstrating incredible acts of culpability against others, even defenseless

children. When a person appears before the court having demonstrated only affection for an orphaned animal and an incredible regard for life, that person should be rewarded. But a narrow mind begets obstinacy and obviously it is very difficult to persuade arbitrary bureaucrats of concepts beyond the scope of their understanding. Constantly our society berates people for failing to become involved or for passing up the opportunity to intervene and redress misfortune. We have become a society that credits ourselves when we do not demonstrate vices instead of regaling those who offer us positive direction. We as people in the United States have a right under our Constitution to resort to all measures to save lives as well as, in the end, to choose to employ no methods to extend our own lives.

The French philosopher Chamfort said, "Intelligent people make many blunders, because they never believe the world to be as stupid as it is." This court does not wish to be stupid and perpetuate the waste of time and resources of this court and the state of Ohio in pursuing this matter. At a time when the state is struggling to find resources to educate our children and to make them intelligent, compassionate people involved in honest, life-enhancing pursuits, it is more than ironic that the state, as well as the Director of Law of Circleville, would choose to allocate the resources of two uniformed officers to pursue a woman who demonstrates no moral culpability whatsoever. This court is not so foolhardy. Therefore, for all the reasons set forth above, the court finds the defendant's motion to be well taken and the case is dismissed forthwith. Further, this grey squirrel shall be permitted to be retained in and about the property of Mary Jane Clifton without further interference, although the court cautions Clifton that it does not expect to view this squirrel being bandied about in public in strange wearing apparel of any kind.

*So ordered.*

This opinion could have been reduced to a simple poem:

The court hereby announces a pearl,
It's sometimes OK to have a squirrel.
The legislature did a statute create,
The Wildlife Division obviously did not equate.
The necessity to be kind, thorough and specific,
The lack of these is legally terrific.
The result is this very short epistle,
The defendant/squirrel is granted a dismissal.